Opinion
 

 HANLON, P. J.
 

 Respondent Bruce Springmeyer, a mechanic with B. C. Lawson Drayage, Inc., was working on the engine in one of Lawson’s Ford
 
 *1547
 
 trucks on April 13, 1992, with the hood up and the engine running, when a fan blade broke off from the engine and struck him in the right shoulder, severing his right arm from his body. Surgeries have reattached the arm, and restored some feeling and movement in the arm, but Mr. Springmeyer, who was right-handed, has lost the use of his right hand, has been unable to resume work, and lives with chronic severe pain from the accident.
 

 Mr. Springmeyer and his wife, respondent Sandra Springmeyer, sued the manufacturer of the fan, Schwitzer, Inc., and the manufacturer of the truck, Ford Motor Company, for damages from the accident based on strict products liability for the fan’s defective design. They also sued Avis Rent A Car System, Inc., a former owner of the truck, for negligent failure to have the fan replaced in response to a Ford recall of these fans. A jury awarded economic damages of $1,400,279 and noneconomic damages of $2.5 million to Mr. Springmeyer (hereafter Springmeyer), and awarded $500,000 to Mrs. Springmeyer for loss of consortium. The jury apportioned fault 50 percent to Ford, 30 percent to Schwitzer, 20 percent to Avis, and 0 percent to the employer, Lawson.
 

 Each of the defendants has appealed, raising multiple issues. The principal arguments raised are: (1) by Schwitzer, that it cannot be held liable because the fans it supplied to Ford were merely components which proved to be defective only in certain engine environments over which Schwitzer had no control; (2) by Schwitzer and Ford, that they were relieved of liability for the accident by Avis’s negligent failure to heed Ford’s recall notice for the fan; and (3) by Avis, that it was deprived of a fair trial because the court erroneously excluded evidence that Avis had sold the truck before it received Ford’s recall notice. We conclude that only this latter argument by Avis has merit, and that another trial, limited solely to whether Avis’s alleged sale occurred, is required.
 

 I. Background
 

 The fan involved in the accident, a Schwitzer C4TA cross-blade fan, was installed as part of the engine cooling system in about 820,000 Ford trucks from 1963 to 1977, including the truck Springmeyer was repairing when he was injured. Fan blades in certain 1970 trucks began cracking and separating, and the problem continued thereafter, reaching a peak in the 1975 models. No definitive cause of the fan blade fracturing was ever identified, but Ford reports in 1977 and 1978 linked the problem with increases in the fan drive ratios of certain engines after 1969. Ford attempted to remedy the problem in 1972 by changing the design of the engines’ water pump, and in 1975 by changing the steel in the fan. When those changes failed to
 
 *1548
 
 eliminate the problem, Ford decided in 1978 to recall about 370,000 1970-1978 model trucks for replacement of the fan with one of a new and stronger design.
 

 Ford’s recall campaign for the fan blade encompassed various mailings to Ford regional managers, Ford dealers, and truck owners in 1979, 1981 and 1982. In February of 1979, a warning letter was sent to the original owners of 1970-1975 model year trucks as shown on Ford’s records of dealer sales. The letter stated that “a defect which relates to motor vehicle safety exists in certain 1971 through 1975 Medium 500 through 750 F, B, LN-Series and 1970 through 1975 Heavy L-Series trucks equipped with FT Gas Engines. ["][] The 20 [inch] diameter cross blade engine cooling fans used in building these vehicles may crack in normal operation. Pieces may separate without warning from a cracked blade while the fan is rotating. Pieces thrown from the rotating fan may damage the vehicle. If the hood is open at the time, persons near the vehicle could be injured.” The letter then set forth the following warning in capital letters: “the engine on your vehicle should not be operated with the hood open for any reason until the engine fan has been inspected and, if necessary, replaced.”
 

 From April 4 to 12,1979, recall notices for trucks covered by this warning letter were sent to current owners identified by a company Ford hired to review state registration records. The notice indicated that Ford dealers would replace the fan free of charge, and gave instructions for accomplishing the repair. Additional recall notices were sent out in October of 1979 for trucks inadvertently omitted from the original mailings. Follow-up notices concerning the fan were sent to registered owners in 1981 and 1982. Ford witnesses Powers and Ausum testified that recall campaigns never end, and Ausum said that a fan blade had been replaced pursuant to the recall as late as January of 1994.
 

 Ford reported to the National Highway Traffic Safety Administration (NHTSA) in April of 1980 that Ford dealers had corrected the fan problem in 107,230 out of 323,972 trucks involved in the recall campaign as of March 31, 1980. Ford’s 1994 figures for the campaign showed 162,761 corrections out of 370,413 trucks. Ford witness Maugh acknowledged that a correction rate of 75 percent is a NHTSA goal for recall campaigns. However, he said that correction rates were generally lower for commercial than personal vehicles because commercial owners were more likely than individual consumers to make their own repairs, and those repairs would not be reported to the manufacturer as corrections. Maugh and Powers also stated that businesses were often less willing than individuals to take their vehicles out of service, and Maugh admitted that Ford did not reimburse businesses for the value of the lost use of their vehicles during repairs.
 

 
 *1549
 
 The truck involved in the accident, a 1975 Ford LN-600 series truck identified as VIN 50429, was originally purchased by Avis in San Francisco, along with three other trucks of the same model, VIN’s 50430, 50431 and 50432. All of these trucks were subject to the fan blade recall campaign. Ford’s records showed that Avis had the fans on VIN’s 50430 and 50431 replaced in response to the recall at a Ford dealership in San Francisco in April and May of 1979. The accident vehicle, VIN 50429, was sold in June of 1979, under circumstances described below, to Springmeyer’s employer, Lawson.
 
 [1]
 
 The original fan in this vehicle was never replaced, and respondents’ expert testified that Springmeyer’s accident was caused by the problem with the fan that had prompted the recall.
 

 Avis, and the workers’ compensation insurer on behalf of Lawson, disputed whether Avis or Lawson received any recall notices for the accident vehicle. Ford witnesses testified in general terms about procedures used in the recall, but Ford had no documentation which confirmed any mailings for this specific vehicle before a 1982 notice to Lawson. Ford contracted with a company called MDI to handle mailings for the recall, MDI had gone out of business, and Ford’s microfilm records of individual mailings in the recall before 1982 had been lost or destroyed. Witness Powers conceded that the accident vehicle could have been included in the August, rather than April, 1979 recall notice mailing, and admitted that she did not know whether Avis or Lawson received any mailings in the recall.
 

 Lawson’s manager, George Lawson, testified that he reviewed the company’s mail during the relevant period and could not remember receiving any recall notices on any of the company’s Ford LN-series trucks. Avis called no witnesses, but argued that Ford’s evidence did not establish that Avis had received a recall notice for the accident vehicle before it was sold to Lawson. Avis noted that it had repaired two trucks in response to the recall, and argued that this showed it would have also repaired the accident vehicle had it received any notice for that vehicle. Avis also noted witness Powers’s concession on behalf of Ford that the February 1979 warning letter did not by itself confirm the need to repair any particular truck, because the letter stated only that “certain” trucks of the specified models were unsafe.
 

 In its special verdict, the jury found that Lawson did not receive any recall notice or warning for the accident vehicle while Lawson owned it. The jury
 
 *1550
 
 found that Avis had received such a notice or warning while it was the owner, and assigned a portion of the fault for the accident to Avis based on a negligent failure to replace the fan in response to the recall.
 

 II. Discussion
 

 A.
 
 Appeals of Schwitzer and Ford
 

 (1)
 
 Schwitzer’s Liability as a Component Part Manufacturer
 

 Schwitzer contends that it should have been exonerated as a matter of law from any liability for the accident under the “component parts manufacturer” defense to respondents’ products liability claim. This argument rests on “a line of cases holding an entity supplying a nondefective raw material or a component part is not strictly liable for defects in the final product over which it had no control.”
 
 (Bay Summit Community Assn.
 
 v.
 
 Shell Oil Co.
 
 (1996) 51 Cal.App.4th 762, 772 [59 Cal.Rptr.2d 322], citing
 
 Lee
 
 v.
 
 Electric Motor Division
 
 (1985) 169 Cal.App.3d 375, 385-387 [215 Cal.Rptr. 195];
 
 Wiler
 
 v.
 
 Firestone Tire & Rubber Co.
 
 (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248]; and
 
 Walker
 
 v.
 
 Stauffer Chemical Corp.
 
 (1971) 19 Cal.App.3d 669, 674 [96 Cal.Rptr. 803].) Under the rule of these cases, the manufacturer of a product component or ingredient is not liable for injuries caused by the finished product unless it appears that the component itself was “defective” when it left the manufacturer.
 
 (Lee
 
 v.
 
 Electric Motor Division, supra,
 
 169 Cal.App.3d at p. 384.)
 

 Schwitzer submits that the defective product in this case was not its C4TA fan, but rather certain Ford engines in which the fan was only a component. The fans were built to Ford’s specifications and worked well in thousands of Ford trucks from 1964 to 1970, when Ford began putting some of them into engines with higher, 1.15 fan drive ratios, where they operated at greater speed. The vibrations in those engines produced a “resonance” which corresponded to the fans’ “natural frequency,” causing them to crack and eventually break in a manner akin to voices shattering glass in the old television commercials.
 
 [2]
 
 As a consequence, Schwitzer stopped making the C4TA fan and designed a new one which vibrated at a different speed. In light of this evidence, Schwitzer engineer Keith Pierson, a fan expert, conceded that the C4TA fan was defective in certain applications, but maintained that there was no defect in the fan itself.
 

 Schwitzer contends that it had no “control” over Ford’s use of the C4TA fan in the engines where it malfunctioned, and thus no liability under the
 
 *1551
 
 reasoning of
 
 Lee, Wiler,
 
 and
 
 Walker.
 
 Schwitzer asserts that “[t]here was absolutely no evidence presented at trial to establish that Schwitzer was involved in the design and testing of the engine environment with the 1.15 ratio, or the fitness of the C4TA fan for this particular engine environment.” Schwitzer’s original blueprints for the C4TA fan had been stamped with the following message: “Caution. Each fan installation must be checked in the application for possible critical vibration throughout the speed range to be assured of satisfactory operation.” Ford personnel concluded, when they decided to recall the C4TA fan, that Schwitzer was “not at fault” for the fan failures, and respondents’ counsel argued to the jury that Ford was the “real culprit” in the case. However, Schwitzer could not be exonerated by other parties’ opinions of its relative culpability, and the fans’ satisfactory performance in some engines was inconclusive because there was substantial evidence that Schwitzer as well as Ford was responsible for the safe design of the fan in the type of engine Springmeyer was repairing.
 

 Ford engineer Mitchell testified that the components of a system, like the fan and the engine in the L-series trucks, are tested together as a unit before they are approved for production and sale. Mitchell was asked about the engineering specifications and test procedures for 1975 LN-600 series trucks, including tests of the C4TA fan. He said that Ford had not preserved the results of tests for 1975 trucks, but that the general procedure would have been as follows: “[0]ur automotive assembly people have quality engineers that receive the engineering specification. They go to the suppliers, and
 
 the supplier runs the test.
 
 They spend some time there, but also review the results of the tests in such a way to establish that quality control and durability objectives are met.”
 

 Mitchell’s description of the test procedure was confirmed by Schwitzer’s engineer. Pierson was asked, “Now, when you perform testing on fans, do you test in all of the engine environments, in
 
 all
 
 of the different engine environments that a fan is going to be placed into?” Pierson answered, “Yes, we do.” Pierson said that Schwitzer set up “strain gauges and then actually put the fan in its vehicle environment. . . and then we operate the vehicle in the worst case setups that we can actually find that we feel that are normal usage out there in the industry.” Indeed, Pierson conceded in his deposition that Schwitzer had designed the fan
 
 for use in LN-600 series engines.
 

 [3]
 

 In view of this testimony, it cannot be said that there was “absolutely no evidence” of Schwitzer’s involvement in design and testing of the C4TA
 
 *1552
 
 fan’s fitness for use in the engine that injured Springmeyer. Pierson said that Schwitzer had no documentation of any testing of the fan in 1.15 ratio engines before 1970, and that he was not certain whether Schwitzer had tested the fan in those engines. However, Pierson said that test results were not always preserved, and that when Schwitzer and Ford learned of problems with C4TA fans by 1972, their first response would have been “to complete an extensive evaluation on the problem, such as testing.” Based on Pierson’s and Mitchell’s testimony, the jury could conclude that Schwitzer was intimately involved in design and testing of the fan for use in all of the engines in which it was installed, including engines of LN-600 series trucks like the one involved in the accident.
 

 The evidence of Schwitzer’s participation in, and responsibility for, testing of the C4TA fan in its engine environments distinguishes this case from cases like
 
 Lee
 
 and
 
 Walker
 
 where the supplier of a component part or raw material was found as a matter of law to have no control over the design of the injury-causing product. (See
 
 Lee
 
 v.
 
 Electric Motor Division, supra,
 
 169 Cal.App.3d at pp. 385-387 [supplier of motor used in 54 different machines, who was not involved in design of meat grinder that injured plaintiff, could reasonably rely on grinder manufacturer to ensure that grinder had adequate safety features];
 
 Walker
 
 v.
 
 Stauffer Chemical Corp., supra,
 
 19 Cal.App.3d at pp. 671-672, 674 [seller of bulk sulfuric acid, a “standard chemical ingredient,” had no control over buyer’s compounding of acid with another chemical into a highly volatile cleaner].) Schwitzer’s situation is also distinguishable from the one in
 
 Wiler
 
 v.
 
 Firestone Tire & Rubber Co., supra,
 
 95 Cal.App.3d 621, where the court refused to hold a tire manufacturer liable for injuries caused by a broken valve stem, designed and installed by Ford, to which the tire was attached. The plaintiff conceded that the tire itself was not defective, and the court reasoned that Firestone “could reasonably believe Ford Motor Company would take appropriate measures to insure proper design and installation of the valve stem.”
 
 (Id.
 
 at p. 629.) Here, the Schwitzer fan was attached to parts manufactured and installed by Ford, but it was the fan that broke, not the Ford parts, and Schwitzer had designed the fan to work properly in Ford engines.
 

 Schwitzer’s position in this instance is more analogous to that of the defendant in
 
 DeLeon
 
 v.
 
 Commercial Manufacturing & Supply Co.
 
 (1983) 148 Cal.App.3d 336, 343 [195 Cal.Rptr. 867], than those of the defendants in
 
 Lee, Walker
 
 and
 
 Wiler.
 
 The defendant in
 
 DeLeon
 
 custom-built “shaker” bins for a fruit processing plant. The plaintiff was cleaning one of the bins when her arm got caught in an adjacent line shaft and was “traumatically severed.”
 
 (Id.
 
 at p. 340.) The line shaft was not connected with the operation of the bin, and had been manufactured and installed by the owner of the plant.
 
 *1553
 
 Plaintiff’s theory of liability was that the bin, as located in the plant, was defectively designed. The defendant maintained that it was not responsible for, or aware of, the bin’s placement in the plant, and the court acknowledged that “the bin itself was not defective.”
 
 (Id.
 
 at pp. 341-343.) However, the plaintiff “urge[d] facts showing the plant operator relied on the expertise of [defendant] when it invited [the defendant’s] employees to come to the plant to view the proposed bin configuration and to construct it properly as a part of the ongoing plant operation.”
 
 (Id.
 
 at p. 343.) “Therefore,” the court reasoned, “. . . we do not have a clear-cut legal question of component part liability, but instead find a factual issue of involvement in design . . . .”
 
 (Ibid.)
 

 The evidence of Schwitzer’s “involvement in design” in this case is stronger than the evidence which created a triable issue of fact in
 
 DeLeon.
 
 Schwitzer was not merely “invited” by Ford to examine how its fan would be used in Ford’s engines. According to Schwitzer’s own witness, Schwitzer actually tested the durability of its fans under “worst case” scenarios in all of the Ford engine environments in which they would be used.
 

 The evidence that fan blades are designed to last for the life of a vehicle, and that Schwitzer’s C4TA fans were prone to break in the normal operation of trucks like the one Springmeyer was repairing, supported a finding that the fan’s design, in this application, was defective under the “consumer expectation” test. (See
 
 Barker
 
 v.
 
 Lull Engineering Co.
 
 (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1] [design is defective if it fails to satisfy “ordinary consumer expectations as to safety in its intended or reasonably foreseeable operation”].) Evidence of the durability testing Schwitzer undertook supported a finding that it was responsible for designing a fan that would operate safely in its various applications, including the one that injured Springmeyer. Accordingly, we conclude that Schwitzer’s liability for defective design of the fan was properly treated as a jury question.
 

 This conclusion is consistent with the limitations of the raw material/ component part supplier defense as applied in California and other jurisdictions. (See generally,
 
 In re TMJ Implants Products Liability Litigation
 
 (D.Minn. 1995) 872 F.Supp. 1019, 1025-1029.) A commentator surveying the law in this area had difficulty finding “any reported cases where a claim against a supplier of a properly manufactured multi-use component or raw material that was not dangerous in normal handling was found to present even a jury question.” (Mansfield,
 
 Reflections on Current Limits on Component and Raw Material Supplier Liability and the Proposed Third Restatement
 
 (1996) 84 Ky. L.J. 221, 232-233 (hereafter Mansfield).) In this case, however, reasonable minds could disagree as to whether the Schwitzer fan had “multiple” uses or was safe “in normal handling.”
 

 
 *1554
 
 The component part cases involve “generic” or “off-the-shelf’ components, as opposed to those which are “ ‘really a separate product with a specific purpose and use.’ ”
 
 {In re TMJ Implants Products Liability Litigation, supra,
 
 872 F.Supp. at p. 1026;
 
 Lee
 
 v.
 
 Electric Motor Division, supra,
 
 169 Cal.App.3d at p. 384.) The fan in this case was designed to be used in Ford engines, and in that sense it had only one purpose and use. On the other hand, it was installed in a number of different truck models, and in that sense had multiple uses. Whether the fan was a “generic” or “off-the-shelf’ component was thus a matter for argument under the circumstances. The danger posed by the fan in its “normal handling” was also debatable. In light of the fan’s satisfactory performance in many vehicles, Schwitzer’s counsel could argue that “it was not the fan . . . that created the problem.” But the recall of thousands of trucks because of hazards posed by their fans prevented any conclusion as a matter of law that the fans were safe. A jury could reasonably find under the circumstances that the fan was defective “ ‘at the time it left the component part manufacturer’s factory.’ ”
 
 (Lee
 
 v.
 
 Electric Motor Division, supra,
 
 169 Cal.App.3d at p. 384.)
 

 Our conclusion that Schwitzer could be held liable is also consistent with the policies underlying the component part supplier defense. “Courts have generally given two policy reasons for why multi-use component and raw material suppliers should not have to assure the safety of their materials as used in other companies’ finished products. First, as stated by the Childress
 
 [Childress
 
 v.
 
 Gresen Mfg. Co.
 
 (6th Cir. 1989) 888 F.2d 45, 49] court, that would require suppliers to ‘retain an expert in the client’s field of business to determine whether the client intends to develop a safe product.’ ” (Mansfield,
 
 supra,
 
 84 Ky. LJ. at p. 240.) Suppliers of “products that have multiple industrial uses” should not be forced “to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use.”
 
 (In re TMJ Implants Products Liability Litigation, supra,
 
 872 F.Supp. at p. 1025.) A second, related rationale is that “finished product manufacturers know exactly what they intend to do with a component or raw material and therefore are in a better position to guarantee that the component or raw material is suitable for their particular applications.” (Mansfield,
 
 supra,
 
 84 Ky. LJ. at p. 241, citing inter alia
 
 Lee
 
 v.
 
 Electric Motor Division, supra,
 
 169 Cal.App.3d at pp. 388-389.)
 

 There is no indication that Schwitzer dictated to Ford how its fans were to be used, but there was testimony that Schwitzer tested the fans for “worst case” wear in all of their applications. Schwitzer employed engineers like Pierson, who said he had conducted “durability testing” of Schwitzer fans for 16 years, including “crack initiation” tests “to determine how long that crack will propagate until it totally separates.” Since Schwitzer endeavored
 
 *1555
 
 to prevent the very problem that caused Springmeyer’s accident, it can fairly be held liable for his injuries. Prevention of such an injury was part of Schwitzer’s own “field of business,” and Schwitzer was in as good a position as Ford to guarantee that its fans would not break in Ford engines.
 

 (2)
 
 Avis’s Failure to Repair the Fan Blade
 

 Schwitzer and Ford both argue that Avis’s negligent failure to replace the fan blade in response to the recall must be deemed as a matter of law to have been a superseding cause of Springmeyer’s accident, which relieved them of any liability for the defective design of the fan. The trial court allowed the jury to determine whether Avis’s negligence was a superseding cause of the accident. The court instructed the jury that if it found that an owner of the truck received “notice from Ford which reasonably advised the owner of the defect and the dangers which could arise from the defect, and if the owner failed to repair the defect, then you may consider that the failure to repair the defect was negligence, and that such negligence supersedes the fault of Ford and relieves Ford of responsibility for the defect.” The court further instructed that Ford could be found liable notwithstanding an “effective” recall of the truck: “If you find that the defendant Ford Motor Company is liable for a design defect, and that such defective product was a substantial factor in bringing about an injury to the plaintiff, but that the immediate cause of the injury was the negligent conduct of Avis or B.C. Lawson Drayage, then the defendant Ford Motor Company is not relieved of liability for such injury if at the time of such conduct defendant Ford Motor Company realized or reasonably should have realized that the risk of harm suffered was reasonably foreseeable, notwithstanding an effective recall campaign.”
 

 The argument that Avis’s negligence was necessarily a superseding cause is based primarily on
 
 Temple
 
 v.
 
 Velcro USA, Inc.
 
 (1983) 148 Cal.App.3d 1090 [196 Cal.Rptr. 531], and
 
 Ford Motor Co.
 
 v.
 
 Wagoner
 
 (1946) 183 Tenn. 392 [192 S.W.2d 840, 164 A.L.R. 364]. The trial court’s decision to treat the issue as one of fact was based on
 
 Balido
 
 v.
 
 Improved Machinery, Inc.
 
 (1972) 29 Cal.App.3d 633 [105 Cal.Rptr. 890]. The parties find some support for their respective positions in each of these cases.
 

 In
 
 Temple,
 
 the defendant manufactured a Velcro hook and loop closure which hot air balloonists began using to secure deflation panels on their balloons. When the defendant, who had “never participated in the design, manufacture, sale or servicing of hot air balloons”
 
 (Temple
 
 v.
 
 Velcro USA, Inc., supra,
 
 148 Cal.App.3d at p. 1092) learned of this use of its product, it asked the Federal Aviation Administration (FAA) to issue a warning that the
 
 *1556
 
 use was dangerous. When the FAA refused, the defendant sent a warning letter to all known owners of balloons using the closures. Subsequently, the closure on a balloon failed and the balloon crashed, killing the plaintiff’s husband. The plaintiff admitted that she and her husband had received the warning, but said, “. . . we didn’t pay any attention to it.”
 
 (Ibid.)
 
 The court stated that “[a]n adequate warning is a sufficient defense to a strict liability action”
 
 (id.
 
 at p. 1094), concluded as a matter of law that the defendant’s letter had been an adequate warning, and affirmed a summary judgment for the defendant. The court added: “What more [the defendant] could have done in issuing its warning, under the circumstances, is hard to imagine."
 
 (Id.
 
 at p. 1095.) In Springmeyer’s case, the jury found that Ford’s recall notice was received and negligently disregarded by Avis, and there is no claim that the notice did not adequately warn of the danger posed by the fan blade. Thus, Ford and Schwitzer contend that they were entitled to judgment under the reasoning of
 
 Temple.
 

 In
 
 Wagoner,
 
 the plaintiff was injured driving a Ford car when the hood flew up, blocking her vision and causing her to crash. The car had been owned by a Mr. Norman, a salesman at a Ford dealership, who sold it to the plaintiff’s friend. While Norman owned the car, Ford learned that hoods on this model could come loose when the catch was not well fastened, and sent auxiliary catches to its dealers with instructions to install them on these cars free of charge. Norman was given one of the new catches, but did not install it because he “ ‘didn’t think it was necessary,’ ” and then represented that the car was in “ ‘perfect repair’ ” when he sold it.
 
 (Ford Motor Co.
 
 v.
 
 Wagoner, supra,
 
 192 S.W.2d at p. 844.) Norman’s failure to repair the catch was held to be a superseding cause of the accident which relieved Ford of liability for negligent manufacture of the car.
 

 The
 
 Wagoner
 
 court applied a rule “of continuing liability of the manufacturer to successive purchasers, subject to be destroyed, however, by the intervening act of an agency which is (1) independent, (2) efficient, (3) conscious, and (4) not reasonably to have been anticipated.”
 
 (Ford Motor Co.
 
 v.
 
 Wagoner, supra,
 
 192 S.W.2d at p. 844.) The court reasoned that Norman’s negligence amounted to a
 
 “conscious
 
 agency” given his experience as a Ford salesman and his knowledge of Ford cars.
 
 (Id.
 
 at pp. 844-845.) The court acknowledged that the issue of superseding cause is “ ‘ordinarily a question for the jury’ ”
 
 (id.
 
 at p. 845), but concluded as a matter of law that Ford “could not have reasonably anticipated the conduct of Norman in rejecting the safety catch"
 
 (id.
 
 at p. 843). “ ‘The chance that such a thing would happen,’ ” wrote the court, “ ‘was so remote as not to come within the scope of reasonable apprehension.’ ”
 
 (Ibid.)
 
 Ford and Schwitzer submit that
 
 Wagoner
 
 cannot be distinguished from Springmeyer’s case.
 

 
 *1557
 
 In the third case,
 
 Balido,
 
 the plaintiff’s hand was crushed in a molding press manufactured by Improved Machinery. After the press was manufactured, Improved learned that press operators were being injured, and it began selling additional safety devices for the press. Improved repeatedly advised plaintiff’s employer that the press was dangerous without the safety devices, which cost $500, but the employer did not purchase them before the accident. The trial court entered a judgment of nonsuit for Improved on claims of negligence and defective design on the ground that the employer’s failure to install the safety devices was a superseding cause of the accident. The court of appeal, in a two-to-one decision, reversed.
 

 The
 
 Balido
 
 majority cited
 
 Wagoner
 
 as the “leading case” for the “general proposition” that “a manufacturer who has taken all reasonable steps to correct its error may succeed in absolving itself from future liability.”
 
 (Balido
 
 v.
 
 Improved Machinery, Inc., supra,
 
 29 Cal.App.3d at p. 648.) However, the majority’s reading of the cases as a whole was that “the extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact.”
 
 {Id.
 
 at p. 645.) The majority wrote: “Insofar as machinery dangerous tó life and limb is involved, we think it a question of fact whether a manufacturer would reasonably anticipate that a wholesaler, a dealer, a retailer, an owner, or a user, may not positively respond to warnings of the need to correct a design deficiency. . . . It is also a question of fact whether the manufacturer of a deficiently designed product could reasonably foresee that a purchaser of the product would not spend additional money to correct the deficiency. Undoubtedly, the manufacturer of a deficiently designed product finds itself in a difficult position when in good faith it attempts to correct a deficiency. Yet its position is not impossible, and the trier of fact may not necessarily decide the issue adversely to the conscientious manufacturer.”
 
 {Id.
 
 at pp. 648-649, citations omitted.) Respondents argue that
 
 Balido’s
 
 reasoning applies equally in this case.
 

 Temple, Wagoner
 
 and
 
 Balido
 
 illustrate what
 
 Balido
 
 calls the “infinite variety of factual situations arising out of corrective efforts”
 
 (Balido
 
 v.
 
 Improved Machinery, Inc., supra,
 
 29 Cal.App.3d at p. 648), and we do not find any of these cases to be dispositive. We recently noted that an issue of superseding cause was “fact specific”
 
 (Torres
 
 v.
 
 Xomox Corp.
 
 (1996) 49 Cal.App.4th 1, 16 [56 Cal.Rptr.2d 455]), and reiterate that observation here.
 
 Temple
 
 and
 
 Balido
 
 are unpersuasive insofar as they imply, respectively, that an adequate warning is invariably “a sufficient defense to a strict liability action,” or that “superseding cause between successive wrongdoers” is invariably a question of fact.
 
 (Temple
 
 v.
 
 Velcro USA, Inc., supra,
 
 148 Cal.App.3d at p. 1094;
 
 Balido
 
 v.
 
 Improved Machinery, Inc., supra,
 
 at p. 647.)
 
 *1558
 
 A third party’s failure to prevent harm threatened by the defendant’s conduct is sometimes held to constitute a superseding cause of that harm (Rest.2d Torts, § 452), but it is “impossible to state any comprehensive rule as to when such a decision will be made.”
 
 (Id.
 
 at com. f, p. 490.) The guiding principles are only generalizations which must be applied to the facts of the particular case.
 

 The basic rule on the subject is that “[tjhird party negligence which is the immediate cause of an injury may be viewed as a superseding cause when it is so highly extraordinary as to be unforeseeable.”
 
 (Torres
 
 v.
 
 Xomox Corp., supra,
 
 49 Cal.App.4th at p. 18; see also Rest.2d Torts, § 447.) “[FJoreseeability is question for the jury unless undisputed facts leave no room for a reasonable difference of opinion,” and “[t]hus, the issue of superseding cause is generally one of fact.”
 
 (Torres
 
 v.
 
 Xomox Corp., supra,
 
 49 Cal.App.4th at p. 19; see also
 
 Ford Motor Co.
 
 v.
 
 Wagoner, supra,
 
 192 S.W.2d at p. 845.)
 

 The evidence indicates that there was nothing “highly extraordinary” about Avis’s failure to respond to Ford’s recall notice for the accident vehicle. According to Ford’s records, only 4,010 of the 370,413 notices sent out in the recall campaign were found to be “undeliverable,” but despite all of the completed mailings only 162,761 of the 370,413 trucks in the recall were brought into Ford dealers for replacement of their fans. Some of the notices might have been sent to people who no longer owned their trucks, and some of the trucks might have been repaired at places other than Ford dealerships, but it appears that recall notices were ignored for thousands of trucks, maybe even a majority of trucks in the recall. Given this low success rate, no particular failure to respond to a recall notice could be called “highly extraordinary.”
 

 Nothing in the record suggests that there was anything unusual about the low success rate for the fan recall. Ford executive Maugh confirmed that success rates below 75 percent were typical for commercial-vehicle recalls like the one here. Ford advised its dealers in a March 1979 bulletin that it had shipped them only 30 percent of the replacement fans needed for the trucks affected by the recall. If Ford anticipated a higher response to the recall, then presumably it would have sent its dealers more replacement fans. Instead, Ford evidently expected that many owners would ignore the recall notices.
 

 Since there was evidence from which the jury could find that Ford could have foreseen (and actually did foresee) that many owners, like Avis, would fail to respond to the recall, we conclude that the issue of superseding cause
 
 *1559
 
 was correctly treated as question of fact in this case.
 
 (Torres
 
 v.
 
 Xomox Corp., supra,
 
 49 Cal.App.4th at p. 19.) As one commentator has noted, “[m]anufacturers are well aware that recall campaigns are disregarded. . . . Such a well-known history of public disregard . . . makes it difficult, if not impossible, for the manufacturer in a subsequent suit to contend that he could not reasonably anticipate the continued use of the product.” (Ramp,
 
 The Impact of Recall Campaigns on Products Liability
 
 (1977) 44 Ins. Couns. J. 83, 91-92 (hereafter Ramp).) The court’s instruction couching the issue in terms of foreseeability correctly stated the applicable law.
 
 (Torres
 
 v.
 
 Xomox, supra,
 
 49 Cal.App.4th at pp. 18-19.)
 

 Our conclusion here is consistent with the one we drew in the
 
 Torres
 
 case. In
 
 Torres,
 
 the manufacturer of a valve that exploded alleged that the owner’s negligent modification of the valve was a superseding cause of the accident.
 
 (Torres
 
 v.
 
 Xomox Corp., supra,
 
 49 Cal.App.4th at pp. 11-12, 16, 18.) Although the way in which the product was modified may not have been foreseeable to the manufacturer, and the modification increased the risk of harm associated with the product’s use, we reasoned that the original design of the product could have been deemed a substantial factor in causing the accident, and thus that the issue of superseding cause was a jury question.
 
 (Id.
 
 at pp. 18-20.) Here, a jury could likewise conclude that the design of the fan and the engine, as well as Avis’s negligence, were substantial factors in bringing about the accident.
 

 The argument for treatment of intervening negligence as a superseding cause was stronger in
 
 Torres
 
 than it is here. There is no evidence here that Avis increased the risk posed by the fan’s defective design; it simply failed to remedy the problem by ignoring a recall of the accident vehicle. Mere failure to prevent harm threatened by the defendant’s conduct is not ordinarily viewed as a superseding cause and, as previously noted, we find no “exceptional” circumstances in this case which would justify an exception to this general rule. (Rest.2d Torts, § 452, com. b, pp. 486-487.) Since it appears that recall notices are often disregarded, there was nothing “exceptional” about Avis’s negligence.
 

 The trial court’s resolution of the superseding cause issue was vindicated by the jury’s verdict. Ford argued to the jury that it should not be held liable for Springmeyer’s accident because its recall notice had been “reasonable and effective as to Avis.” The jury found that Avis received the notice and negligently failed to respond to it, but that Avis was only 20 percent liable for the accident. If, as Ford and Schwitzer contend, the issue of superseding cause was so clear that reasonable minds were bound to find that Avis was solely responsible for the accident, then the jury could have been expected to allocate a much higher percentage of fault to Avis.
 

 
 *1560
 
 The
 
 Temple
 
 and
 
 Wagoner
 
 cases relied upon by Ford and Schwitzer are both distinguishable. There was no evidence here of conscious, deliberate disregard of a safety notice or measure such as occurred in
 
 Temple
 
 and
 
 Wagoner.
 
 The evidence and findings show only that Avis received the recall notice and failed to respond to it.
 
 [4]
 
 The reason for the failure is not apparent; insofar as it appears from the record, Avis could simply have misplaced the notice. Thus, the facts here are closer to those in
 
 Comstock
 
 v.
 
 General Motors Corporation
 
 (1959) 358 Mich. 163 [99 N.W.2d 627, 635, 28 A.L.R.2d 449], another leading case of its day on “termination of risk” (Noel,
 
 Manufacturer’s Negligence of Design or Directions for Use of a Product
 
 (1962) 71 Yale L.J. 816, 871 (hereafter Noel)), than they are to those of
 
 Temple
 
 or
 
 Wagoner.
 

 In
 
 Comstock,
 
 an employee named Wentworth at a General Motors dealer forgot that a car brought in for new brakes could not be stopped, and drove it into a coworker. In the resulting suit against General Motors based on defective design of the brakes, the court refused to hold as a matter of law that Wentworth’s negligence was a superseding cause of the accident. “The jury could have found that the negligence of General Motors set this whole train of events in motion and played a substantial role in the final event. The intervening negligence herein was not deliberate or wanton or willful. Nor was it extraordinary in character. Wentworth did not deliberately determine to drive a car with no brakes. He forgot.”
 
 (Comstock
 
 v.
 
 General Motors Corporation, supra,
 
 99 N.W.2d at p. 635.)
 

 Temple
 
 and
 
 Wagoner
 
 are distinguishable in other respects as well. Under the component part supplier defense outlined above, it is questionable whether the defendant in
 
 Temple,
 
 who did not design its product for hot air balloons, had any obligation to warn of the dangers of an end-use of its product over which the court found it had no control. (See Mansfield,
 
 supra,
 
 84 Ky. L.J. at p. 222 [component part supplier cannot be sued on failure to warn theory].) Unlike the Ford salesman in
 
 Wagoner,
 
 there is no showing here that Avis, the intervening actor who failed to implement the remedial measure, had any particular expertise with respect to Ford vehicles. (See Ramp,
 
 supra,
 
 44 Ins. Couns. J. at pp. 90-91 [reconciling
 
 Wagoner
 
 and
 
 Comstock
 
 based on the “ability of the expert to disrupt the chain of causation”].)
 
 [5]
 

 Wagoner
 
 has also been criticized for, among other things, concluding as a matter of law that Ford could not reasonably have anticipated that
 
 *1561
 
 someone might think a remedial measure was unnecessary. (See Noel,
 
 supra,
 
 71 Yale L.J. at p. 870 and authorities cited.)
 
 Wagoner
 
 is questionable insofar as it reasoned that failure to install a safety catch on the hood of a car was as unforeseeable as someone throwing lighted matches into gasoline.
 
 (Ford Motor Co.
 
 v.
 
 Wagoner, supra,
 
 192 S.W.2d at p. 843.)
 

 Also, while
 
 Wagoner
 
 may tend to support Schwitzer and Ford’s position on the issue of superseding cause, many precedents from other jurisdictions are in accord with our decision. (See, e.g.,
 
 Gracyalny
 
 v.
 
 Westinghouse Elec. Corp.
 
 (7th Cir. 1983) 723 F.2d 1311,1323;
 
 Pan-Alaska, etc.
 
 v.
 
 Marine Const. & Design Co.
 
 (9th Cir. 1978) 565 F.2d 1129, 1136-1137;
 
 Anderson
 
 v.
 
 Whittaker Corp.
 
 (W.D.Mich. 1987) 692 F.Supp. 734, 759;
 
 Holmes
 
 v.
 
 Wegman Oil Co.
 
 (S.D. 1992) 492 N.W.2d 107, 114;
 
 Ford Motor Company
 
 v.
 
 Matthews
 
 (Miss. 1974) 291 So.2d 169, 176-177.)
 

 “A number of courts have . . . refused to hold that a dealer’s negligence in failing to make repairs in a product absolves the manufacturer from liability for harm caused by defects in its products.”
 
 (Gracyalny
 
 v.
 
 Westinghouse Elec. Corp., supra,
 
 723 F.2d at p. 1323, fn. 26.) If negligent failure to repair by the manufacturer’s own dealer is not necessarily a superseding cause, there is no reason why such negligence on the part of a mere consumer should be so treated. In
 
 Anderson
 
 v.
 
 Whittaker Corp., supra,
 
 692 F.Supp. 734, a suit against the manufacturer of a boat that sank, the court held that the owner’s “failure to install a rear bilge pump cannot be held to have been a superseding cause of [the accident], even in light of the fact that the manufacturer conducted a recall and retrofit campaign. A manufacturer cannot automatically insulate itself from liability by sending out notifications of possible defects, particularly where the notice does not reach the ultimate consumer of the product. ... In any event, it will be a question of fact in any given case whether a consumer’s failure to protect against a defect in a product was unforeseeable in light of the manufacturer’s notice.”
 
 (Id.
 
 at p. 759, citations omitted.)
 

 We return finally to the third case emphasized by the parties,
 
 Balido,
 
 where the alleged superseding cause was an owner’s failure to install safety devices on a molding press. The manufacturer had learned of the need for
 
 *1562
 
 the devices after selling the product, and had offered unsuccessfully to sell them to the plaintiff’s employer for $500.
 
 Balido
 
 supports respondents’ position on the issue of superseding cause insofar as it reasons that the foreseeability of “safety neglect” in the handling of dangerous machinery “presents an issue of fact.”
 
 (Balido
 
 v.
 
 Improved Machinery, Inc., supra,
 
 29 Cal.App.3d at p. 645.) As previously indicated, however, Balido’s blanket pronouncements about issues of fact are not persuasive. Some kinds of “safety neglect,” like throwing a match into gasoline, may as a matter of law be too remote to be foreseeable. Moreover,
 
 Balido
 
 contains another line of reasoning which supports the arguments of Ford and Schwitzer.
 

 Balido
 
 indicates that the manufacturer of a defectively designed product may be absolved of liability by a showing that it has taken all reasonable steps to correct its error.
 
 (Balido
 
 v.
 
 Improved Machinery, Inc., supra,
 
 29 Cal.App.3d at p. 648.) The opinion refers to “the factual nature of an inquiry as to whether the manufacturer has done what it could reasonably be expected to do to correct an earlier design deficiency”
 
 (id.
 
 at p. 648), and then holds that “[i]n the present case a trier of fact might have concluded that [the manufacturer] had not done everything reasonably within its power to prevent injury to [the plaintiff]”
 
 (id.
 
 at p. 649). This holding was premised on the manufacturer’s failure to furnish safety devices to the plaintiff’s employer free of charge: “[The manufacturer] warned [the employer] on several occasions that the press did not meet California industrial safety standards, but offered to conform the press to those standards only at a cost of $500. Quaere: Should [the manufacturer] have reasonably anticipated that a purchaser of a second-hand press would ignore its warnings of inadequate safety devices and refuse to spend money to purchase additional safety equipment?”
 
 (Ibid.)
 

 Here, Ford warned Avis of the problem with the fan
 
 and
 
 offered to replace it for free. Thus, Ford submits that it did “everything reasonably within its power” to prevent injury from the fan, and cannot be held liable for Springmeyer’s accident. However, even if Ford did all it could to see that the fan was repaired while Avis owned it, Ford would not thereby necessarily shift all responsibility for Springmeyer’s accident to Avis.
 

 It is established that a manufacturer “ ‘cannot delegate to anyone its duty to have its product delivered to the ultimate user free from any defects’ ”
 
 (Hasson
 
 v.
 
 Ford Motor Co.
 
 (1982) 32 Cal.3d 388, 406 [185 Cal.Rptr. 654, 650 P.2d 1171]), and
 
 Balido
 
 is untenable to the extent it suggests otherwise. A manufacturer cannot delegate responsibility for the safety of its product to
 
 *1563
 
 dealers, much less purchasers. (See
 
 Ford Motor Co.
 
 v.
 
 Robert J. Poeschl, Inc.
 
 (1971) 21 Cal.App.3d 694, 698 [98 Cal.Rptr. 702];
 
 Southern Pac. Co.
 
 v.
 
 Unarco Industries, Inc.
 
 (1974) 42 Cal.App.3d 142, 151 [116 Cal.Rptr. 847].) “[T]he obligation of a manufacturer to the ultimate user is such that it cannot delegate to its purchaser responsibility for the final inspection, corrections and adjustments necessary to make the product ready for use, and that the manufacturer cannot escape liability on the ground that the defect in the product was caused by something the purchaser did or failed to do. . . .”
 
 (Southern Pac. Co.
 
 v.
 
 Unarco Industries, Inc., supra,
 
 at p. 151, citations omitted.)
 

 One court in the foregoing line of cases anticipated the result we reach today. In
 
 Ford Motor Co.
 
 v.
 
 Robert J. Poeschl, Inc., supra,
 
 21 Cal.App.3d 694, Ford notified its dealers to recall certain cars to have their brake lights fixed. One of these cars had been leased, and was involved in an accident resulting from a defective brake light. Ford settled with the injured parties, and sought indemnity from the dealer and leasing agency for failing to implement the recall. Under the “all-or-nothing” rule of indemnity that applied at the time, the court concluded that Ford had no recourse because it was primarily responsible for the accident. Of particular relevance here is the court’s call (eventually heeded in
 
 American Motorcycle Assn.
 
 v.
 
 Superior Court
 
 (1978) 20 Cal.3d 578, 597, 599 [146 Cal.Rptr. 182, 578 P.2d 899]) for replacement of all-or-nothing indemnity with partial indemnification based on comparative fault, to fairly apportion liability in a situation like the one before us: “The dealer and the leasing agency shared Ford’s ability to reach the customer before an accident occurred. The complaint does not disclose whether these firms were stirred by the recall notice. On the assumption that they did nothing, their escape from financial responsibility is troublesome. Judicially favored objectives of deterrence and accident prevention would be promoted by imposing
 
 some
 
 liability on a dealer who knew of danger and did nothing. To shift the
 
 entire
 
 loss to him would not serve these objectives, for then the manufacturer would escape scot-free. A wise rule of law—one designed to stimulate responsibility throughout the merchandising chain— would require both parties to
 
 share
 
 the loss.”
 
 (Ford Motor Co.
 
 v.
 
 Robert J. Poeschl, Inc., supra,
 
 21 Cal.App.3d at p. 699, italics added.) We likewise conclude that Ford did not necessarily “escape scot-free” because someone failed to heed one of its recall notices. A trier of fact could properly determine Ford’s fair “share” of responsibility under the circumstances.
 

 (3)
 
 Other Contentions
 

 (a)
 
 Substantial Evidence of Causation
 

 Ford contends that there was no substantial evidence from which the jury could find that the fan’s defective design was a legal cause of the
 
 *1564
 
 accident. Ford argues that, given the lapse of time between the manufacturing of the fan and the accident, Lawson’s alleged failure to properly maintain the truck, and the manner in which the fan fractured, it would be mere speculation to conclude that the fan’s design was a substantial factor in causing the accident. This argument has no merit.
 

 Respondents’ expert, Robert Lipati, testified that the accident resulted from the defective design of the fan. Lipati was asked at the end of cross-examination about Ford’s letter to the NHTSA and other Ford documents explaining the need for the fan recall. He was then asked on final redirect examination about the accident in this case: “Now, the bottom line is that this fan fractured as was described in Ford’s own documents; right, sir?”; to which he replied, “Yes, sir.” This exchange equated Lipati’s previous detailed testimony about why the fan in this case broke with the detailed explanations in Ford’s documents about why such fans were prone to break, and thereby established a prima facie case of causation. The jury could “logically and reasonably” infer from Lipati’s testimony that the accident was attributable to the fan’s defective design.
 
 (Campbell
 
 v.
 
 General Motors Corp.
 
 (1982) 32 Cal.3d 112, 121 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].)
 

 Ford submits that Lipati was unable to eliminate other possible reasons the fan might have broken, such as “improper fan bolt torquing,” and that the location of the crack was inconsistent with other fan failures. However, respondents were “not required to disprove every possible alternative explanation of the injury in order to have the case submitted to the jury.”
 
 (Campbell
 
 v.
 
 General Motors Corp., supra,
 
 32 Cal.3d at p. 121.) This is not one of the unusual cases where mere passage of time after manufacturing must be regarded as a superseding cause because it is undisputed that the fans were expected to last for the life of the vehicle. (See
 
 Balido
 
 v.
 
 Improved Machinery, Inc., supra,
 
 29 Cal.App.3d at pp. 642-644.) Ford did not disclose in response to pretrial contention interrogatories that it would be claiming the accident resulted from negligent maintenance of the vehicle. As a consequence, the court ruled that Ford could not argue the point at trial, and instructed the jury that negligent maintenance of the truck was not an issue. Since Ford does not challenge or even mention that ruling in its briefs, Ford has not properly raised any issue of negligent maintenance. The subject would have been no more than a consideration for the jury in any event.
 

 (Campbell
 
 v.
 
 General Motors Corp., supra,
 
 at p. 121.)
 

 (b)
 
 The Jury’s Allocation of Fault
 

 Ford and Schwitzer both contend that the jury’s allocation of fault—80 percent to them and only 20 percent to Avis—must be set aside as
 
 *1565
 
 grossly disproportionate to their culpability. Apart from rearguing the facts, their principal point appears to be that because Avis was found negligent, a form of “fault,” whereas they were found only strictly liable, a form of liability “without fault,” the jury was required to allocate most of the damages to Avis. However, there is no such rule and we do not reweigh evidence. “[Jjuries are fully competent to apply comparative fault principles between negligent and strictly liable defendants.”
 
 (Safeway Stores, Inc.
 
 v.
 
 Nest-Kart
 
 (1978) 21 Cal.3d 322, 331 [146 Cal.Rptr. 550, 579 P.2d 441]; see also
 
 Daly
 
 v.
 
 General Motors Corp.
 
 (1978) 20 Cal.3d 725, 738 [144 Cal.Rptr. 380, 575 P.2d 1162].) We find no grounds to second-guess the jury’s assessment of fault based on the evidence presented at the trial.
 

 B.
 
 Avis’s Appeal
 

 (1)
 
 Receipt of Recall Notice
 

 Avis contends that the judgment against it must be reversed because there was no substantial evidence to support the jury’s finding that Avis received a recall notice for the 1975 Ford truck involved in the accident, VIN 50429, while Avis owned it. Respondents acknowledge that Avis’s liability was predicated on this finding.
 

 For reasons discussed below, it was stipulated that Avis owned the truck until June 19, 1979. Ford had no records of mailings for individual vehicles in the recall before 1982, and the court concluded that Ford was not entitled to an Evidence Code section 641 presumption of receipt of correctly addressed letters because it had hired an outside firm to handle the mailings. (See
 
 Ruffino
 
 v.
 
 City of Los Angeles
 
 (1964) 226 Cal.App.2d 67, 69 [37 Cal.Rptr. 765].) However, Ford’s evidence indicated that recall notices for 1975 trucks as a group were sent out from April 4 to 12, 1979. Repair records for the recall showed that Avis repaired two of the 1975 trucks it had originally purchased from Ford along with the accident vehicle, VIN’s 50430 and 50431, on May 17, 1979, and April 30, 1979, respectively, and thus that Avis had received the April 1979 recall notices for those trucks.
 

 Avis submits that evidence of its receipt of notices for those trucks was insufficient to support a reasonable inference that it also received a notice for VIN 50429. However, the evidence showed that trucks were identified for inclusion in the recall based on their serial numbers, and the jury could “logically and reasonably” infer
 
 (Campbell
 
 v.
 
 General Motors Corp., supra, 32
 
 Cal.3d at p. 121; Evid. Code, § 600, subd. (b)) that notices for trucks of the same year and model, with serial numbers in sequence—50429 (the accident vehicle), 50430 and 50431 (repaired vehicles)—would have been included in the same mailing.
 

 
 *1566
 
 Avis notes that Ford witnesses could not deny the
 
 possibility
 
 that the notice for VIN 50429 might have been left out of the April 1979 mailing, and sent instead in October 1979, after Avis no longer owned the vehicle, along with other notices inadvertently omitted from previous mailings. However, Ford’s records showed that notices for 232,099 trucks—about two-thirds of the 370,413 trucks eventually added to the recall—had been mailed by April 12, 1979. The total number of trucks added to the recall after April of 1979 (138,314 [370,413 - 232,099]), exceeded the number of 1975 models covered by the April 1979 notices (49,282, according to Ford’s records). However, the recall spanned eight model years, and there was no showing that the percentage of 1975 models covered by post-April 1979 notices was any higher than the percentages of other models covered by such notices. Insofar as it appears from the record, only about one-third of the notices for
 
 all
 
 models were omitted from the mailings completed by April 1979. It thus appears that the notice for VIN 50429 was
 
 likely
 
 included in the April 1979 mailing.
 

 Accordingly, we conclude that there was substantial evidence from which to infer that Avis received a recall notice for the accident vehicle in April of 1979. Avis points out that the opposite inference could also have been drawn. Avis argues that the repairs it made in response to the recall showed that it would have repaired the accident vehicle had it received a notice for that vehicle. However, this was an argument for the jury. The fact that the evidence supported opposing inferences is no ground to reverse the verdict. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 370, pp. 420-422 [rule of conflicting inferences].)
 

 (2)
 
 Superseding Cause
 

 Avis contends that, even if it negligently failed to repair the accident vehicle, Ford’s failure to follow up on the recall after 1982 must be regarded as a superseding cause of the accident. Ford records showed by 1980 that Lawson had acquired the vehicle, and that the vehicle was never repaired in response to the recall. Ford witnesses testified that safety recalls stay “open forever.” Avis apparently reasons as follows: (1) because recalls continue indefinitely, and Ford knew that the accident vehicle had not been repaired, Ford had a continuing duty to follow up on the recall for this truck; (2) Ford breached this duty by failing to mail further notices to Lawson after 1982; and (3) this breach of duty was a superseding cause of the accident.
 

 Avis cites no authority supporting its claim that Ford’s follow-up procedures for the fan recall were deficient, and the only evidence at trial was to the contrary. Ford’s evidence indicated that, in addition to the original recall
 
 *1567
 
 notice to Avis, it mailed two follow-up notices for the truck to Lawson. Ford presented uncontradicted testimony that regulatory standards for the conduct of recalls do not require any follow-up notices. When Ford witnesses said that safety recalls are ongoing, they meant that Ford would continue to replace the defective fans free of charge, not that Ford recognized any ongoing duty to mail follow-up notices indefinitely.
 
 [6]
 
 The fact that Ford had no record of having repaired a particular truck did not necessarily mean that the truck had not been repaired; it meant only that the repair had not been done at a Ford dealer, where Ford had a record of the work. Thus, any failure to respond to repeated notices could have meant that the owner was not inclined to replace the fan, or that the fan had in fact been replaced outside a Ford dealership.
 

 Therefore, it is not apparent that Ford was negligent in failing to furnish further follow-up notices for the truck. It appears to the contrary that Ford made reasonable efforts to recall the fan. We have no basis to conclude as a matter of law that failure to mail more notices was such an “exceptional” circumstance as to constitute a superseding cause of the accident. (Rest.2d Torts, § 452, com. b, pp. 486-487.)
 

 Avis objects that the jury instructions cited Avis’s failure to repair the vehicle, but not Ford’s failure to follow up on the recall, as a possible superseding cause. However, the failures were not comparable. Avis’s conduct was negligence; Ford’s conduct was not. We note that Avis did not request an instruction on superseding cause, and that the instructions the court gave did not prevent Avis from arguing that the recall was deficient insofar as that bore on the issue of comparative fault. No reason appears why Avis did not make that argument if it thought it would have carried any weight.
 

 (3)
 
 Instruction on Negligence
 

 Avis contends that jury instructions pertaining to its negligence were erroneous. In the previously quoted instruction on Avis’s negligence as a possible superseding cause of the accident, the jury was advised that if the owner of a vehicle failed to repair it after receiving reasonable notice of a defect, “then you
 
 may
 
 consider that the failure to repair the defect was negligence.” A later instruction stated, however, that “if Avis received a letter or other notice from Ford which reasonably advised of the defect and
 
 *1568
 
 the dangers which may arise from the defect, then the failure to have the defect repaired
 
 is
 
 negligence,” and another instruction repeated that such a failure “is” negligence. Avis argues that these latter instructions were erroneous because there could have been some innocent explanation for the failure to repair, such as a lack of replacement fans at the Ford dealer, and that the error was prejudicial because it prevented Avis from positing such excuses to the jury.
 

 However, as respondents point out, the owner of a vehicle has both a statutory and common law duty to keep it in good repair.
 
 (Yamaha Motor Corp.
 
 v.
 
 Paseman
 
 (1990) 219 Cal.App.3d 958, 965 [268 Cal.Rptr. 514].) Thus, a jury can be instructed that an owner with knowledge of a vehicle’s defective condition is negligent if it permits the vehicle to be operated in that condition.
 
 (Mallot v. Blue Diamond Corp.
 
 (1957) 156 Cal.App.2d 186, 188, 190 [319 P.2d 391].) It is unlikely in any event, given the severity of Springmeyer’s injury and the fact that it could have been prevented by the simple expedient of changing a fan blade, that the jury would have entertained any speculation about innocent reasons for the failure to repair. (See
 
 Soule
 
 v.
 
 General Motors Corp.
 
 (1994) 8 Cal.4th 548, 574 580 [34 Cal.Rptr.2d 607, 882 P.2d 298] [no reasonable probability that verdict stemmed from challenged instruction].) There was no error or prejudice in connection with the jury instructions on Avis’s negligence.
 

 (4)
 
 Evidence of Sale to International Harvester
 

 Avis offered to prove that by March of 1979, before the April 1979 recall notices went out, it had sold and delivered the accident vehicle to International Harvester. Avis proffered relevant and admissible evidence on this point which, if believed by the jury, would have absolved Avis from any liability. We therefore agree with Avis that the court’s decision to exclude this evidence was prejudicial error.
 

 (a)
 
 Record
 

 In his opening statement, Avis’s counsel told the jury that Avis’s defense would be based on the sale to Harvester, and he outlined the evidence Avis would present to prove that the sale occurred.
 
 [7]
 
 Counsel said that Avis stopped renting trucks in 1982, and retained no records of the sale. However, the sale would be established through Department of Motor Vehicle (DMV) records and testimony from former employees of Avis and Harvester. Randy
 
 *1569
 
 Hearn would testify that he had signed the vehicle’s “pink slip” on behalf of Avis, and delivered it to Harvester along with the truck. A Mr. Veilleux would testify that Harvester converted trucks into flatbeds, and DMV records would show that Harvester had converted the accident vehicle to a flatbed by March 12, 1979. Since DMV records showed that Harvester had the vehicle by March 12, 1979, and that Avis paid the vehicle’s registration fee sometime after October 1978, counsel estimated that the sale to Harvester probably took place in January or February 1979. Avis would also call Joseph Testa, another former Avis employee in San Francisco, who would testify that he did not specifically remember the fan blade recall, but remembered that there had been a fan blade problem, and that repairs were done at Ford’s San Francisco dealership in 1979. Testa would aver that Avis heeded vehicle recall campaigns, either by seeing that the trucks Avis leased out were retrieved and repaired, or by returning postcards to the manufacturers which identified the new owners of any trucks Avis had sold.
 
 [8]
 

 Thereafter, during the trial, Ford filed a motion
 
 in limine
 
 to exclude any evidence or reference to a sale of the accident vehicle from Avis to Harvester. Ford identified two ways for a seller to document the date a vehicle is sold: (1) delivering a signed and dated certificate of ownership (pink slip) to the buyer (Veh. Code, §§ 5600, subd. (a), 5602, subd. (a), 5751, 5753); or (2) mailing a notice of the sale to the DMV (Veh. Code, §§ 5600, subd. (b), 5602, subd. (b), 5900, subd. (a), 5901, subd. (b)). The pink slip for the accident vehicle, which was signed by Avis as owner, Harvester as dealer, and Lawson as purchaser, was not dated to reflect the timing of any sale from Avis to Harvester; it was dated June 19, 1979, the date of Lawson’s purchase. DMV records for the vehicle did not include any notice of sale from Avis to Harvester. Thus, Ford argued that Avis had not followed either of the procedures required for a “bona fide” sale of the vehicle to Harvester. Citing this court’s decision in
 
 Laureano
 
 v.
 
 Christensen
 
 (1971) 18 Cal.App.3d 515, 525 [95 Cal.Rptr. 872], to the effect that “strict compliance” with the vehicle transfer statutes is required, and that declarations purporting to establish the date of a transfer are irrelevant, Ford argued that Avis’s proposed testimony on the timing of the alleged sale was inadmissible.
 

 Schwitzer filed a motion
 
 in limine
 
 on the same date as Ford, seeking to exclude the DMV record which stated that the accident vehicle had been modified into a flatbed on March 12, 1979. This document was executed on behalf of Harvester on June 19, 1979, the date of the sale to Lawson, by someone whose name appears to be “E. Smith,” the same person whose
 
 *1570
 
 signature appears for Harvester on the pink slip showing the Lawson sale. Schwitzer argued that the document was inadmissible under the business records exception to the hearsay rule.
 

 In its written response to these motions and at the hearing on the motions, Avis elaborated on the testimony it planned to elicit. Avis’s former manager would testify that it had been Avis’s practice, in selling vehicles to dealers like Harvester, to file notices of sale with the DMV, rather than to date the pink slip Avis signed and delivered to the dealer. The date on the pink slip could be left blank pending a sale to the dealer’s customer because a dealer, unlike other buyers, does not have to register the transfer of a vehicle it acquires for resale; a dealer can wait until the resale before reporting the transfer to the DMV. (Veh. Code, § 5906.) Avis’s counsel explained that the DMV’s records did not include a notice of sale for the accident vehicle because the DMV routinely purges such notices from its files. Veilleux, the Harvester salesman who sold the truck to Lawson, would testify that he remembered Harvester converting the truck into a flatbed before the sale. Avis’s former manager would testify that the truck was a van body rather than a flatbed when Avis sold it to Harvester. By the time the motions
 
 in limine
 
 were heard, George Lawson had already testified that the truck was a flatbed when he bought it.
 

 The court granted the motions
 
 in limine
 
 and excluded all evidence of any sale to Harvester. The court concluded that testimony concerning the sale, and evidence of the flatbed conversion, were irrelevant in the light of the “strict compliance” rule applied in the
 
 Laureano
 
 case for the documentation of vehicle sales. After the court ruled on the motions, Avis secured a stipulation from the parties that the DMV does in fact routinely purge notices of sale from its files, and thus that the absence of such a notice from the DMV records for the accident vehicle was no proof that no such notice had been filed. In light of the rulings on the motions, Avis called no witnesses and was forced to stipulate that it owned the accident vehicle until the vehicle was sold to Lawson on June 19, 1979.
 

 (b)
 
 Analysis
 

 The trial court’s ruling on the evidence in question was based on our decision in the
 
 Laureano
 
 case. However, the date-of-transfer issue in
 
 Laureano
 
 was different from the one presented here.
 

 The issue in
 
 Laureano
 
 was whether the defendant was an “owner” within
 
 the meaning of the
 
 owner liability statute (Veh. Code, § 17150) of a car involved in an accident. Under this statute, a vehicle “owner” is liable for
 
 *1571
 
 injuries caused by the negligence of anyone who operates the vehicle with the owner’s express or implied permission. “This statutory liability of the owner is predicated on the theory of imputation of wrongdoing and is entirely independent from any liability based on his or her own negligence.” (8 Cal.Jur.3d, Automobiles, § 378, p. 475.) An owner is not relieved of liability under this statute merely by making a “bona fide sale” of the vehicle. (Veh. Code, § 5602.) The owner must also, as outlined above, either deliver a signed and dated pink slip to the buyer (Veh. Code, § 5602, subd. (a);
 
 Laureano
 
 v.
 
 Christensen, supra,
 
 18 Cal.App.3d at p. 521), or furnish a notice of sale to the DMV (Veh. Code, § 5602, subd. (b)).
 

 Laureano
 
 is one of many cases requiring “strict compliance” with these additional rules to achieve the statutory goal of protecting those injured by negligently operated vehicles.
 
 (Stoddart
 
 v.
 
 Peirce
 
 (1959) 53 Cal.2d 105, 115 [346 P.2d 774] and cases cited;
 
 Laureano
 
 v.
 
 Christensen, supra,
 
 18 Cal.App.3d at pp. 522, 524.) The rules “show a purpose that the
 
 date
 
 of the change of motor vehicle ownership be made certain, otherwise the statutory goal would be largely defeated.”
 
 (Laureano
 
 v.
 
 Christensen, supra,
 
 at p. 522.) As explained in
 
 Laureano,
 
 injured parties should have “more certain indicia of ownership than mere possession” of a vehicle; they should have access to recorded information showing the date of sale.
 
 (Ibid.)
 

 There is no claim here against Avis under the owner liability statute. Even if Avis failed to comply with the statute, its exposure thereunder ended upon the sale to Lawson.
 
 (Durbin
 
 v.
 
 Fletcher
 
 (1985) 165 Cal.App.3d 334, 348 [211 Cal.Rptr. 483] [continuing liability of predecessor owners terminates when successor owner complies with the statute].) Avis was not tried on a theory of vicarious liability. Respondent sought to hold Avis liable for Avis’s own negligence in failing to have the accident vehicle repaired in response to Ford’s recall notice. The date-of-transfer issue raised by Avis’s evidence is: Who owned the vehicle when the recall notice went out in April of 1979, Avis or Harvester? The answer to this question does not turn on whether “ownership” was effectively transferred for purposes of the owner liability law.
 

 Parties who fail to comply with the owner liability statute remain “owners” for purposes of the statute, even if they no longer have title to or possession of the vehicle. “There is no doubt that the word ‘owner” as used in [the owner liability statute] for the purpose of creating a liability thereunder, is not synonymous with that word as used in the ordinary sense of referring to a person or persons whose title is good as against all others. Under the Vehicle Code there may be several such ‘owners’ at any one time. One or more persons may be an ‘owner,’ and thvliable for the injuries of a
 
 *1572
 
 third party, even though no such ‘owner’ possesses all of the normal incidents of ownership.”
 
 (Stoddart
 
 v. Peirce,
 
 supra,
 
 53 Cal.2d at p. 115.) Thus, a seller may remain liable under the statute even if “ownership of the vehicle has been effectively transferred between the seller and buyer.”
 
 (Brennan
 
 v.
 
 Gordon Ball, Inc.
 
 (1985) 163 Cal.App.3d 832, 839 [210 Cal.Rptr. 32]; see also
 
 Scoggins
 
 v.
 
 Kristoff
 
 (1979) 96 Cal.App.3d 771, 775 [158 Cal.Rptr. 244].) Whether there has been a “bona fide” sale of a vehicle between the seller and buyer depends not on compliance with the owner liability law, but rather on “the nature of the agreement between the parties to the transaction.”
 
 (Hidalgo
 
 v.
 
 Anderson
 
 (1978) 84 Cal.App.3d 378, 382 [148 Cal.Rptr. 557].)
 

 The issue in this case is whether the accident vehicle was “effectively transferred”
 
 between Avis and Harvester,
 
 not whether Avis complied with the owner liability law incident to the alleged sale. If, as between Avis and Harvester, Harvester owned and possessed the vehicle when Avis received the recall notice, then Avis had no duty (or ability) to ensure that the vehicle was repaired pursuant to the notice. At that point, Harvester was the owner and operator of the vehicle for purposes of any negligent failure to keep it in good repair.
 
 (Yamaha Motor Corp.
 
 v.
 
 Paseman, supra,
 
 219 Cal.App.3d at p. 965.) Failure to comply with the owner liability statute in connection with the sale would have left Avis vicariously liable for any negligence on the part of Harvester, but, again, vicarious liability is not at issue.
 

 Avis’s witnesses offered to testify to a bona fide sale of the accident vehicle to Harvester, accompanied by delivery of the truck and documents of title, and mailing of a notice of sale to the DMV. They should not have been prevented from so doing based on the need for “strict compliance” with a statute that did not apply.
 

 Moreover, the “strict compliance” rule cited in
 
 Laureano
 
 does not preclude all oral testimony about vehicle transfers, even where the issue is compliance with the owner liability statute. The seller in
 
 Laureano
 
 neither dated the pink slip nor claimed to have filed a notice of sale. In these circumstances, where the undisputed evidence showed that the statute had been violated, we concluded that the injured parties were not required to “accept and be bound by the [seller’s] statement that the sale took place sometime in ‘March of 1967.’ ”
 
 (Laureano
 
 v.
 
 Christensen, supra,
 
 18 Cal.App.3d at p. 522.) In
 
 Enis
 
 v.
 
 Specialty Auto Sales
 
 (1978) 83 Cal.App.3d 928 [148 Cal.Rptr. 255], on the other hand, where the documentary record
 
 *1573
 
 was inconclusive, the court allowed the defendants to testify that they had in fact complied with the statute, and such testimony was held to constitute sufficient evidence to support a verdict in their favor on that issue.
 

 The vehicle in
 
 Enis
 
 was sold by defendant Dubose to Specialty Auto Sales, a dealership operated by defendant Palombino, which sold it in turn to the driver who collided with the plaintiff. Dubose testified that he had filed a notice of his sale to the dealer, even though the DMV had no record of ever receiving it. Specialty Auto Sales filed a notice of its sale to the driver, and the issue as to that notice was whether it had been mailed within three business days of the sale, as was then required under the statute for notices by dealers (Veh. Code, § 5901). Specialty Auto Sales sold the vehicle on September 15, 1972, and the DMV did not receive the notice of sale until September 22, 1972. There was no record of when the notice had been mailed, but Palombino testified that it was his usual practice to send notices of sale within the period prescribed by the statute. The jury accepted the testimony of Dubose and Palombino, and judgment was entered in their favor. The plaintiff argued on appeal that the testimony was insufficient to support the verdict. That argument was rejected: “While we agree with plaintiff that the evidence produced by defendants was weak, we cannot say that it was insufficient, as a matter of law, to support the jury’s verdict. The question of credibility was one for the jury. They were entitled to believe Palombino’s testimony regarding his usual practice of mailing a notice of sale to the Department of Motor Vehicles within three business days after a sale; also, Dubose’s testimony on deposition that he had mailed a transfer of automobile form to the Department of Motor Vehicles sometime during the week after he sold the Buick to Specialty Auto Sales. Under these circumstances, the trial court was correct in denying plaintiff’s motion for judgment notwithstanding the verdict.”
 
 (Enis
 
 v.
 
 Specialty Auto Sales, supra,
 
 83 Cal.App.3d at p. 941; see also
 
 Durbin
 
 v.
 
 Fletcher, supra,
 
 165 Cal.App.3d 334, 346 [court may look to “actual facts” concerning notice of sale; defendants testified that they never mailed notices on a Sunday].)
 

 Enis
 
 establishes that Avis’s testimony would have been admissible even if this were a “strict compliance” case. Avis’s proposed testimony concerning its alleged notice of sale for the accident vehicle is indistinguishable from the testimony admitted in
 
 Enis,
 
 and at least as plausible. Like the dealer in
 
 Enis,
 
 Avis’s manager would have testified to Avis’s customary procedure in connection with sales like the one at issue. Unlike defendant Dubose, Avis had an explanation for the absence of its notice from the DMV file—the undisputed fact that the DMV would have purged any such notice from its records by the time of trial.
 

 
 *1574
 
 The trial court should have allowed Avis to call its witnesses concerning the sale to Harvester, and should not have excluded the DMV record of the flatbed conversion under the “strict compliance” rule.
 
 [9]
 

 Exclusion of the testimony about the sale was manifestly prejudicial to Avis. Avis was thereby prevented from putting on the case it had promised to the jury, and left instead with the sole defense that it might not have received the April 1979 recall notice for the accident vehicle. The evidence Avis offered of a sale of the vehicle to Harvester by March of 1979, if believed by the jury, would have completely exonerated Avis of any liability. Thus, the failure to allow Avis to present this defense deprived Avis of a fair trial.
 

 Although the jury was instructed that Avis could be held liable for failing to repair the vehicle if it had received a “letter or other notice” advising it of the problem with the fan, the February 1979 warning letter alone, without a later recall notice, did not trigger a duty to repair any particular truck. Ford’s own witness conceded this point. The letter stated only that the fan was defective in “certain” trucks of specified models, and that the recall would be implemented in the “near future,” when instructions would be sent about replacing the fan. The letter stated that a Ford dealer should be contacted in the meantime only if “your vehicle has a cracked or broken cooling fan.”
 

 Ford’s appellate briefs note in passing a lack of evidence that “Avis warned either International Harvester or B.C. Lawson of the fan’s potentially dangerous condition.” It is not apparent that Avis had a duty to furnish any such warning to Harvester, much less Harvester’s buyer, and it is unclear whether Ford is suggesting that this alleged duty could have arisen solely from Avis’s receipt of the February 1979 warning letter, or from receipt of the April 1979 recall notice after Avis had sold the truck. The point is immaterial in any event because the issue was not raised against Avis at trial. (9 Witkin, Cal. Procedure,
 
 supra,
 
 Appeal, § 399, pp. 451-452 [theory of trial].) The case against Avis hinged entirely on its failure to replace the fan in response to the recall, and thus upon its receipt of the April 1979 recall notice before the truck’s alleged sale.
 
 [10]
 

 
 *1575
 
 C.
 
 Conclusion
 

 The error with respect to Avis requires a second trial, but only on the narrow issue of whether Avis sold the accident vehicle to Harvester by March of 1979. (See
 
 Schelbauer
 
 v.
 
 Butler Manufacturing Co.
 
 (1984) 35 Cal.3d 442, 457 [198 Cal.Rptr. 155, 673 P.2d 743, 38 A.L.R.4th 566] [retrial can be ordered bearing solely on apportionment of damages].) If the trier of fact concludes that the sale did occur, then a judgment must be entered against Ford and Schwitzer holding them jointly and severally liable for the full amount of the damages found at the first trial. This result follows from the recent case of
 
 Wimberly
 
 v.
 
 Derby Cycle Corp.
 
 (1997) 56 Cal.App.4th 618 [65 Cal.Rptr.2d 532] (review den. Oct. 22, 1997).
 

 The plaintiff in
 
 Wimberly
 
 was injured when the fork assembly on his bicycle broke. He sued the producer and distributor of the fork assembly, Derby, along with the manufacturer and retailer of the assembly, for negligence, breach of warranty and strict liability. The plaintiff settled with the manufacturer, dismissed its case against all defendants other than Derby, and secured a judgment for economic and noneconomic damages against Derby on a strict product liability claim. Derby appealed on the ground that the jury should have been required to assess comparative fault between Derby, the manufacturer, the retailer, and a designer of the assembly who had not been named as a defendant, for purposes of apportioning liability for the noneconomic damages under Proposition 51.
 

 The court held that Proposition 51 “has no application in a strict product liability case where, as here, the plaintiff’s injuries are caused solely by a defective product. A strictly liable defendant cannot reduce or eliminate its responsibility to the plaintiff for all injuries caused by a defective product by shifting blame to other parties in the product’s chain of distribution who are ostensibly more at ‘fault,’ and therefore may be negligent as well as strictly liable. The defendant’s recourse, if not precluded by good faith settlement principles, lies in an indemnity action.”
 
 (Wimberly
 
 v.
 
 Derby Cycle Corp., supra,
 
 56 Cal.App.4th at p. 633.)
 

 Wimberly
 
 acknowledged that fault had been apportioned between strictly liable and negligent defendants in
 
 Daly
 
 v.
 
 General Motors Corp., supra,
 
 20 Cal.3d 725, and
 
 Safeway Stores, Inc.
 
 v.
 
 Nest-Kart, supra,
 
 21 Cal.3d 322, but distinguished those cases on the ground that they involved injuries caused in part by negligence outside the product’s chain of distribution: in
 
 Daly
 
 by the contributory negligence of the decedent; in
 
 Safeway
 
 by the owner’s negligent maintenance of the product.
 
 (Wimberly
 
 v.
 
 Derby Cycle Corp., supra,
 
 56 Cal.App.4th at pp. 631-632.)
 

 
 *1576
 
 Here, Avis was not sued for strict liability on the theory that it was part of the fan’s chain of distribution. Like the owner in
 
 Safeway,
 
 Avis was sued on a theory of negligent maintenance. If Avis is not liable for negligence, then the situation in this case becomes the same as the one in
 
 Wimberly,
 
 where responsibility for the accident rests entirely with defendants in the chain of distribution of a single product who are strictly liable.
 
 [11]
 
 In that event, Proposition 51 does not apply and there is no need for a retrial to apportion damages.
 
 (Wimberly
 
 v.
 
 Derby Cycle Corp., supra,
 
 56 Cal.App.4th at p. 633.)
 

 If the trier of fact finds that the alleged sale did not occur, then Proposition 51 requires that fault be allocated between Avis on the one hand, and Ford and Schwitzer jointly, on the other hand (see
 
 Wimberly
 
 v.
 
 Derby Cycle Corp., supra,
 
 56 Cal.App.4th at p. 633, fii. 9), but no retrial of this allocation is needed. The only error in this case pertained to the question of Avis’s ownership of the vehicle in April of 1979. If the trier of fact rejects Avis’s claim that it had sold the vehicle by that time, we already have the results of a full and fair trial based on the assumption that such a sale did not occur, and there is no reason to repeat that exercise. Thus, if Avis does not prevail in the second trial, the original judgment must be reinstated, with one modification: The 50 percent and 30 percent allocations of fault to Ford and Schwitzer, respectively, must be replaced by a single 80 percent allocation to Ford and Schwitzer jointly. This change is dictated by
 
 Wimberly's
 
 holding that defendants in a product’s chain of distribution are to be treated as a “single unit for purposes of determining and allocating fault under Proposition 51.”
 
 (Ibid.)
 

 III. Disposition
 

 The judgment is reversed and the case is remanded for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.
 

 Poché, J., and Reardon, J., concurred.
 

 A petition for a rehearing was denied February 26, 1998, and the opinion was modified to read as printed above. Appellants’ petitions for review by the Supreme Court were denied May 13, 1998. Mosk, J., was of the opinion that the petitions should be granted.
 

 [1]
 

 Lawson also bought VIN 50432. Photographs of VIN 50432 after Springmeyer’s accident showed that it was equipped with the five-blade spider hub fan which Ford used in 1978 as a replacement for the original fan, pending the redesign and manufacturing of the new fan used in the recall. The five-blade spider hub fan was considered safe, and would not have been replaced in the recall.
 

 [2]
 

 Resonance could be caused by various conditions in the engine such as belt tension and “water pump bearing wobble,” and Ford and Schwitzer could never determine the precise source of the problem.
 

 [3]
 

 The following exchange from Pierson’s deposition was read into the record: “Question: ‘Do you know what the purpose of the fan was?’ Answer: ‘From my knowledge, yes.’ Question: ‘And what was its purpose?’ Answer: ‘To—to satisfactorily cool that application and to be, you know, designed for that application.’ Question: ‘What is the application?’ Answer: ‘The LN-600 vehicle.’ Question: ‘So, Schwitzer designed the fan to be used on the engine that was involved in this accident; is that right, sir?’ Answer: ‘Yes.’ ”
 

 [4]
 

 The jury was instructed that Avis was negligent if it received the recall notice and failed to act on it. Avis’s argument that this instruction was erroneous is addressed below.
 

 [5]
 

 This commentator elaborates on the distinction as follows: “Relieving the manufacturer of responsibility for a defective or potentially dangerous product by shifting the proximate cause for any later injury to the recipient of a recall notice leaves the public exposed to the continued use of defective goods, thereby defeating the purpose underlying the recall. The
 
 *1561
 
 intervener must therefore possess sufficient expertise to allow competent, independent evaluation of the potential danger. His disagreement with the manufacturer’s assessment of the risks involved represents a superceding [sic] decision, which makes the intervenor liable for any subsequent injury.” (Ramp,
 
 supra,
 
 44 Ins. Couns. J. at p. 91; see also
 
 Rekab, Inc.
 
 v.
 
 Frank Hrubetz & Company
 
 (1971) 261 Md. 141 [274 A.2d 107, 111] [manufacturer of amusement park ride exonerated from liability for ride’s collapse by park operators’ failure to install replacement part furnished by manufacturer; court found it “significant” that operators had many years of experience in the amusement park business].)
 

 [6]
 

 Ford witness Ausum was asked, “As far as the recall department is concerned and the systems department is concerned, do the recall campaigns ever end?” She replied, “No, not a safety or emissions campaign. That stays open forever. So, you could bring in a 1965 vehicle that is in our system with an open campaign, and we would repair it, and we would reimburse the dealer.”
 

 [7]
 

 Respondents’ claim on appeal that Avis made no offer of proof concerning the alleged sale is specious in light of Avis’s opening argument. Avis did more than make an offer of proof to the court; it told the
 
 jury
 
 what its evidence would be.
 

 [8]
 

 Ford’s April 1979 recall notice for the fan asked recipients to “[p]lease complete the enclosed prepaid postcard and return it to us if you no longer own the truck.... Your input is needed to update our records.”
 

 [9]
 

 Whether the DMV document is admissible apart from the “strict compliance” rule is left for the determination of the trial court on remand.
 

 [10]
 

 Because Avis’s claim to have sold the vehicle by March of 1979 will, if true, be a complete defense for Avis, we need not determine whether Avis would have been immune under Vehicle Code section 24007 from any liability even if the sale had occurred at some later date. (See
 
 Fruehauf Corp.
 
 v.
 
 Lakeside Chevrolet Co.
 
 (1981) 117 Cal.App.3d 783, 789 [173 Cal.Rptr. 55] [by operation of this statute, sale to dealer relieved seller from “any liability to the consumer for negligence, breach of implied warranty or strict liability”].)
 

 [11]
 

 We have no occasion to consider how Wimberly’s reasoning might be applied where the injury results from exposure to multiple products.