**WAL–MART STORES, INC., and National Union Fire Insurance Company of Pittsburgh PA Plaintiffs**

v.

**RLI INSURANCE COMPANY Defendant**

No. CIV. 99–5074.

United States District Court, W.D. Arkansas, Fayetteville Division.

March 23, 2001.

Marshall S. Ney, Leigh Anne Yeargan, Mitchell, Williams, Selig, Gates & Woodyard, Little Rock, AR, James D. Wagoner, Lynne Thaxter Brown, Murray B. Wells, Patrick Toole, McCormick, Barstow, Sheppard, Wayte & Carruth, LLP, Fresno, CA, for Plaintiffs.

Richard N. Watts, David M. Donovan, Watts & Donovan, P.A., Little Rock, AR, Clyde C. Greco, Jr., Phillip M. McKenney,

Jon S. Brick, Greco, Traficante & Edwards, San Diego, CA, for RLI Ins. Co.

John C. Calhoun, Jr., Phil W. Campbell, Hilburn, Calhoon, Harper, Pruniski & Calhoun, LTD, North Little Rock, AR, for Cheyenne Indus.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

This declaratory judgment action is once again before the court on cross-motions for summary judgment. Wal–Mart and its primary insurer, National Union Fire Insurance Company of Pittsburgh PA, move for summary judgment arguing they have no obligation to pay any portion of an $11 million settlement paid in a personal injury products liability action. RLI Insurance Company has also moved for summary judgment arguing that it is entitled to contribution from Wal–Mart and/or National Union in the amount of $10 million.

Also before the court is the motion of Wal–Mart and National Union for reconsideration of this court's February 23, 2000, opinion. In that opinion, we ruled that the terms of the applicable insurance policies governed the allocation of liability among the insurance companies rather than the terms of a vendor agreement between Wal–Mart and Cheyenne Industries.

### Background.

This case arose out of a personal injury products liability action filed on May 15, 1998, *Boykin, et al. v. Wal–Mart Stores, Inc., et al.*, Case No. 717912, in the San Diego County Superior Court, California. The product at issue was a torchiere style halogen floor lamp [1] imported and/or supplied by Cheyenne [2] and sold at one of Wal–Mart's retail stores in April or May of 1997 to Lisa Sikorski.

The bulb of the halogen floor lamp was alleged to have exploded igniting a residential fire that started in the bedroom of the minor plaintiff, Jazmin Boykin. Jazmin suffered severe injuries. Her mother, Lisa Sikorski, and her aunt, Lora Gomez, also sustained damages to a lesser extent. Although primary emphasis was given to the product liability claims concerning the allegedly defective lamp, the *Boykin* plaintiffs also claimed Wal–Mart was, *inter alia*, guilty of an intentional tort in selling the lamp with the knowledge that it or its component parts were defective and unreasonably dangerous. The *Boykin* plaintiffs further alleged that the injuries from the

1. In general, torchiere halogen lamps may be described as a pole lamp, approximately 6′ high, consisting of a metal pole in three segments that screw together, a weighted circular base approximately 12 inches in diameter, a switch on the pole, a lamp shade that at the top is shaped like an Oriental cooking wok, and a tubular, tungsten halogen bulb of either 300 or 500 watts of output.

2. To be fair, the court must note that it is RLI's position that the records are unclear as to whether Cheyenne Industries or Groton Industries, Inc., a company based in Taiwan, acted as the vendor for the lamp in question. The lamp at issue in the *Boykin* litigation apparently was not, or cannot be, tied to a specific purchase order between Wal–Mart and any vendor. Nevertheless, Cheyenne,

RLI's insured, admitted in responding to requests for admissions in the *Boykin* action that it sold the lamp in question to Wal–Mart. The court has also been furnished portions of depositions and/or affidavits in which Cheyenne's officers or agents definitively state the lamp in question was a Cheyenne lamp and that Groton acted only as Cheyenne's agent in any dealings with Wal–Mart. *See e.g., August 24, 2000, Deposition of Alan Long* at 92 (Long testified he was able to identify the lamp at issue in the *Boykin* case because it had a Cheyenne UPC tag). *Id.* at 131 ("Groton never distributed any lamps to Wal–Mart at any time other than through Cheyenne."). *See also August 25, 2000, Deposition of John Rowland* at 10 (Was able to identify the lamp at issue in the *Boykin* case as a Cheyenne lamp by its UPC code).

fire were enhanced by negligently manufactured or defective bedding that was distributed by Wal–Mart.[3] Finally, the *Boykin* plaintiffs asserted a claim based on a faulty or miswired fire alarm against the builder/owner of the Boykin home.[4]

As part of the *Boykin* litigation, Wal–Mart and Cheyenne filed cross-complaints against each other for indemnity. In September of 1998, the *Boykin* plaintiffs demanded $11 million in settlement from Cheyenne and an additional $10 million in settlement from Wal–Mart. In November of 1998, plaintiffs demanded $16 million to resolve the claims, $11 million of which was attributed to Cheyenne and $5 million to Wal–Mart. *November 11, 1998, letter from Duncan Koler to Clyde Greco, Jr.* The apportionment was "based on [plaintiffs'] current understanding as to how the subject product was distributed and sold." *Id.*

After settlement of the claims involving the bedding materials, the *Boykin* plaintiffs made a demand of $11 million to settle all remaining claims against both Cheyenne and Wal–Mart. *January 14, 1999, letter from Duncan Koler to Mark Vranjes and Barry Snyder.* The letter stated the offer was "meant as a global, policy limits demand as to Cheyenne and Wal–Mart." *Id.* Counsel were reminded that "under California law defendants' insurance carriers will be liable for *all* damages awarded to plaintiffs at trial, including punitive damages." *Id.*

After receipt of this offer, Snyder demanded, on behalf of Wal–Mart, that both St. Paul and RLI "satisfy the settlement demand, timely and in full." *January 14, 1999, letter from Barry C. Snyder to Clyde*

*Greco and Pam Matsufuji.* Cheyenne's two insurance companies, its general liability insurer, St. Paul Surplus Lines Insurance Co., and its umbrella or excess liability insurer, RLI, funded the settlement.

The court approved the settlement finding that it was made in good faith pursuant to California law. Thereafter, all claims, including the cross-claims, were dismissed with prejudice.

National Union, the commercial general liability insurer for Wal–Mart, filed this action seeking a declaration that Wal–Mart's vendor agreement with Cheyenne governed the apportionment of liability as between Wal–Mart's and Cheyenne's insurance companies. By virtue of the indemnification and insurance provisions of a vendor agreement that existed between Wal–Mart and Cheyenne, National Union contended Cheyenne's insurers, St. Paul and RLI, were primarily liable up to the applicable limits of those policies. As the *Boykin* case was settled for the combined policy limits of the St. Paul and RLI policies, it was National Union's position that it had no liability for monies paid in settlement of the *Boykin* case.[5]

The St. Paul policy was a commercial general liability policy with a $1 million limit for products and completed operations. The RLI policy was a commercial umbrella liability policy with a $10 million aggregate limit of liability for products/completed operations. It is undisputed that Wal–Mart was considered an additional insured under the St. Paul and RLI policies. As mentioned above, to settle the *Boykin* case, both St. Paul and RLI paid their applicable limits.

---

**3.** These claims were settled for $35,000.

**4.** This claim was settled for $500,000.

**5.** The settlement in the *Boykin* case exhausted Cheyenne's insurance coverage during the

policy period involved. *August 24, 2000, Deposition of Alan Long* at 157. As a result, Cheyenne paid settlements in two other lawsuits during this period. *Id.* The settlements also involved Cheyenne lamps sold at Wal–Mart retail stores.

While RLI paid its limits, it contended at all times that pursuant to the express terms of its policy it provided only excess insurance as far as Wal–Mart was concerned. During the *Boykin* litigation, RLI repeatedly, albeit unsuccessfully, demanded that National Union, as Wal–Mart's primary insurer, take part in efforts to settle the case.

By memorandum opinion and order entered on February 23, 2000, we ruled that, under the circumstances of this case, the terms of the vendor agreement did not override the express terms of the insurance policies. The vendor agreement only required Cheyenne to obtain commercial general liability insurance in a specified amount[6] and to name Wal–Mart as an additional insured on its commercial general liability policy. The agreement did not require Cheyenne to obtain an umbrella or excess policy. In our case, Cheyenne had two levels of insurance. Therefore resort to, and application of, the "other insurance" clauses of the RLI and National Union policies did not render the provisions of the indemnity agreement ineffectual.

We concluded so far as Wal–Mart was concerned that the insurance coverage afforded it under the RLI policy was excess to the coverage provided Wal–Mart under the National Union policy. The February

23rd opinion quoted at length from the vendor agreement and the applicable policies as well as setting forth in some detail the events ultimately culminating in the current suit. Familiarity with that opinion is assumed.

National Union and Wal–Mart ask the court to reconsider the February 23rd ruling to the extent necessary to resolve the issue of allocation presented by RLI's counterclaim. First, to the extent the court reads its prior order to preclude discussion of the indemnity agreement for purposes of determining whether RLI is entitled to reimbursement, or if the court believes its prior order dictates some reimbursement to RLI, the court is asked to reconsider the February 23rd ruling.

Second, plaintiffs ask the court to reconsider the primary/excess issue to the extent the court determined National Union's excess clause did not apply. This request is based on two pieces of evidence not before the court on the prior motions. These pieces of evidence are: (1) a certificate of insurance showing that Wal–Mart was an additional insured on the RLI policy; and (2) a letter from Cheyenne's counsel to RLI's counsel dated November 27, 1998, a date after initiation of the *Boykin* litigation, in which Cheyenne's counsel states: "Cheyenne purchased the instant policy to protect it from damage claims

---

6. The agreement specified the vendor must carry commercial general liability insurance including products and completed operations with Wal–Mart named as additional insured as evidenced by attached endorsement with limits of $2 million per occurrence. An asterisked notation indicates the limits are $5 million "[i]f determined by Wal–Mart as a high risk vendor." Nothing on the face of the vendor agreement between Wal–Mart and Cheyenne indicates Wal–Mart considered Cheyenne to be a high risk vendor. However, by affidavit Teresa Parker, a buyer for Wal–Mart, asserts that Wal–Mart considered all lighting vendors to be "high risk" vendors and Cheyenne was aware of this fact. At no time, during the court's consideration of the first set of cross-summary judgment motions, was the court advised of the $5 million insurance requirements for high risk vendors or of the fact that Cheyenne was considered to be a high risk vendor. This is true despite the fact that the vendor agreement and its insurance requirements were specifically at issue. *See also August 29, 2000, Deposition of Craig Livesay* at 126 (Livesay was produced for deposition as National Union's person most knowledgeable regarding the handling of the *Boykin* claim. He testified it was his understanding that the vendor agreement required Cheyenne to have two million dollars of coverage.)

resulting from its products, to comply with its obligation to protect its vendors (as required by applicable vendors' agreements) and to ensure that all indemnity claims available to its vendors would be covered." [7] The letter is, in plaintiffs' opinion, an admission of an authorized agent that the policy was bought specifically, in part, for the purpose of satisfying Cheyenne's contractual obligation.[8]

Finally, plaintiffs ask the court to reconsider its ruling that the indemnity and insurance provisions of the vendor agreement do not control RLI's right to reimbursement because the court now knows Cheyenne cannot be brought into this action by way of third-party complaint. Plaintiffs suggest the court "assume[d] in making its order on the summary judgment motions that the issue of the indemnity agreement could be more properly addressed by way of a third party complaint by WAL–MART against CHEYENNE."

In light of the court's February 23rd opinion, Wal–Mart and National Union filed a third-party complaint against Cheyenne based on the terms of the indemnification agreement. RLI and Cheyenne then filed motions to dismiss the third-party complaint.

On June 14, 2000, we entered an order directing National Union and Wal–Mart to show cause why the third-party complaint should not be dismissed for lack of supplemental jurisdiction. On June 27, 2000, the third-party complaint was dismissed for lack of subject matter jurisdiction.

The February 23rd opinion left for later determination the issue of whether RLI could recover from National Union any portion of the $10 million RLI paid to settle the *Boykin* case. It is this issue that is currently before the court.

### Summary Judgment Standard.

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir.1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985)).

### Discussion.

#### 1. The Parties' Arguments.

The positions taken by the parties could not be more diametrically opposed. Na-

---

**7.** This letter conveys no facts regarding the actual purchase of the RLI policy. Obviously, the letter was written after initiation of the *Boykin* litigation and after RLI asserted its policy provided no coverage for Wal–Mart until exhaustion of the National Union policy.

**8.** By declaration, Lynne Thaxter Brown, an attorney for the plaintiffs, states the plaintiffs first received the letter by way of RLI's response to requests for production of documents. Brown reviewed the document on or about August 21, 2000.

tional Union and Wal–Mart contend no portion of the settlement was paid for liability other than that of Cheyenne. As the liability discharged was Cheyenne's, they contend RLI is not entitled to recoup even one cent of the $10 million it paid. In contrast, RLI contends it is entitled to recover from National Union the entire $10 million.

The briefs and attached exhibits submitted by the parties are voluminous. We will not attempt to set forth in any detail the arguments of the parties. However, for discussion purposes, it is necessary to attempt to broadly outline those arguments.

According to National Union and Wal–Mart, the undisputed evidence is that if Wal–Mart is liable as the retail seller of the lamp, Cheyenne, as the wholesale distributor thereof, was also equally liable. Plaintiffs state that, with the exception of the bedding claims, the underlying allegations against Wal–Mart and Cheyenne were for the same conduct, namely, for knowingly selling a dangerous and defective product and failing to take appropriate steps to remove the product from the market. Thus, they contend RLI cannot prove that any portion of what it paid in settlement was not attributable to the potential liability of Cheyenne either to the plaintiffs in the *Boykin* action or by way of indemnification owed to Wal–Mart. Plaintiffs argue RLI certainly cannot establish that Cheyenne was free of fault thus entitling RLI to complete indemnity. National Union points out RLI insured both Cheyenne and Wal–Mart while National Union only insured Wal–Mart.

To the extent Wal–Mart had any potential liability independent of Cheyenne,

plaintiffs contend the present status quo of the rights and obligations of Wal–Mart and Cheyenne preclude RLI from obtaining indemnity against the plaintiffs. As Cheyenne's fault is co-extensive to Wal–Mart's, Wal–Mart contends Cheyenne could not obtain indemnity[9] from it. Further, plaintiffs argue that since RLI controlled the settlement of the underlying action, its failure to obtain an allocation of the relative fault in that action should preclude it from doing so here.

Moreover, because of the express contractual indemnification provisions contained in the vendor agreement, even if RLI can establish it is entitled to recover all, or some portion of, the amount it paid in the settlement from Wal–Mart or National Union, any such recovery would only operate to replenish the RLI policy. The RLI policy, to the extent so replenished, would then, in the plaintiffs' opinion, clearly afford coverage for Cheyenne's obligation to indemnify Wal–Mart and National Union, by way of subrogation to the rights of Wal–Mart.

Thus, according to plaintiffs, the ultimate result would be the same and RLI would remain liable for the full amount it paid in settlement. In such circumstances, the plaintiffs suggest the court should follow the course of action taken by Justice Learned Hand in *Maryland Cas. Co. v. Employers Mut. Liab. Ins. Co.*, 208 F.2d 731, 732–33 (2d Cir.1953) and leave the parties where they presently stand in order to avoid an unnecessary and wasteful circuity of action.

RLI contends National Union must pay the entire $10 million. This is true in RLI's view for two reasons. First, RLI

---

**9.** According to plaintiffs, Cheyenne, under the vendor agreement, assumed all responsibility for the defective product, including Wal–Mart's own alleged negligence in connection with the sale of the product. Further, since

the RLI policy contains contractual liability coverage, Wal–Mart contends the RLI policy provides coverage to Cheyenne for such liability.

contends National Union is obligated to fund the settlement because under the express terms of RLI's policy all available insurance, including the National Union policy, must be exhausted before the RLI policy is implicated.

Second, RLI contends National Union is estopped by its failure to participate in the settlement, a breach of its obligations to its insured and to RLI as an excess carrier and as a subrogee of Wal–Mart, from challenging the settlement. In this regard, RLI contends National Union's failure to participate in the settlement was unreasonable as a matter of law, rendering it liable to RLI for the entire $10 million. Further, RLI points out Wal–Mart and National Union did not reserve any rights to argue how much of the settlement should be allocated to Cheyenne's potential liability. RLI also asserts that National Union never took the position that it would not participate in the settlement because the facts showed Cheyenne had greater liability. Rather, National Union took the position that the effect of the vendor agreement made RLI's coverage primary.

Moreover, RLI contends Wal–Mart is barred from suing Cheyenne for indemnity on the basis of *res judicata* and, as a subrogee of Wal–Mart, National Union has no basis to seek reimbursement from Cheyenne or RLI. In RLI's view, there can be no question that the settlement of the *Boykin* action was made on behalf of Wal–Mart. RLI points out that Wal–Mart and National Union were fully apprised of ongoing settlement negotiations, Wal–Mart insisted any settlement include it, the settlement agreement specifically released Wal–Mart and its insurers from liability to the *Boykin* plaintiffs, and Wal–Mart was included in a good faith determination of the settlement which, under California law, protects Wal–Mart from any claims for equitable indemnity or contribution from any other joint tortfeasor.

Finally, RLI contends Wal–Mart was 100% liable for the sale of the lamp at issue in the *Boykin* case and bears sole responsibility to pay for the settlement. In RLI's opinion, Wal–Mart's continued sale of the "old style" lamps without appropriate guards or warnings to consumers constituted an efficient, independent, and intervening proximate cause which superseded or broke the causal connection of the negligence, if any, of Cheyenne in connection with the halogen lamp. As Wal–Mart bore responsibility to settle the *Boykin* action, its carrier, National Union, in RLI's view, has no basis to seek contribution from RLI.

Even assuming Cheyenne was liable under the terms of the vendor agreement, RLI contends the exposure of Cheyenne's carriers, St. Paul and RLI, under the indemnification agreement would be limited to $2,000,000. Therefore, RLI contends its maximum exposure was $1,000,000. On this basis, RLI argues that if the court fails to find National Union responsible for the entire $10,000,000 it should at least be required to pay $9,000,000.

## 2. The Relationship Between Cheyenne and Groton.

Cheyenne, one of the Frank Fletcher Companies, sold and distributed products to Wal–Mart, including halogen torchiere lamps. Cheyenne purchased the halogen lamps through Groton Industries, a corporation based in Taipei, Taiwan. Groton was responsible for finding manufacturers for products that met Cheyenne's shipping and quality requirements. According to Cheyenne's president Alan Long, Groton's "sole function [was] to act as the agent for Cheyenne Industries, Legacy Lamps, and Silverwood Products." *August 24, 2000, Deposition of Alan Long* at 28–29. In fact, Groton was incorporated for the specific purpose of acting as agent for the

Frank Fletcher Companies. *Id.* at 30–32. According to Long, at no time did Groton deal directly with Wal–Mart on any issues. *Id.* at 47.

Initially, the lamps Cheyenne purchased were shipped to Cheyenne's distribution points in Little Rock, Arkansas, and from there Cheyenne would ship the lamps to various Wal–Mart warehouses. *Id.* at 28. In 1994 or 1995, as part of efforts to contain costs, Cheyenne authorized shipments directly from Groton to various customers' distribution points. *Id.* at 49. Wal–Mart was one customer for whom this practice was authorized. *Id.*

According to Long, Cheyenne's role did not change, other than the fact that the lamps were not physically handled through its distribution centers. *Id.* According to Teresa Parker, a buyer employed by Wal–Mart, Groton acted as Cheyenne's agent. *August 22, 2000, Deposition of Teresa Parker* at 32. Although Groton was assigned a vendor number [10] when the direct shipping or import arrangement was made, she considered Cheyenne and Groton to be the same vendor. *Id.* at 32 & 52. In her mind Cheyenne was Wal–Mart's vendor and it "submitted the product for us to determine what we wanted to purchase. They tracked sales on the product. They took care of any customers on the product, any customer calls or letters that we received. They were our only contact for the product." *Id.* at 36. She never dealt directly with Frank Hwang at Groton. *Id.* at 33. In Parker's view, Wal–Mart "didn't actually import lamps directly through Groton, we imported them through Cheyenne." *Id.* at 52.

However, even after the cost savings measure was implemented, some halogen lamps were distributed to Wal–Mart through Cheyenne's Little Rock facility.

There appears to be no way to determine whether the halogen lamp at issue in the *Boykin* case was distributed out of Cheyenne's facility or was sent directly by Groton to Wal–Mart.

In RLI's view, as of 1994, Wal–Mart was a direct importer of the lamps and Cheyenne was, at best, part of the distribution chain in name only. Of course, a user or consumer may sue any entity involved in the distribution of a product. While RLI seeks to discount the testimony, primarily of Long and Parker, regarding the agency relationship between Groton and Cheyenne, it presents nothing suggesting such an agency relationship did not exist. Additionally, the lamp at issue in the *Boykin* case was specifically identified as a Cheyenne lamp both by officers of Cheyenne and by the *Boykin* plaintiffs.

Obviously, it would not have been in Cheyenne's best interests for its officers to verify the lamp was a Cheyenne product, if in fact it was not. It was apparent from the beginning that the personal injuries to Jazmin Boykin were catastrophic. A seller of a product is liable to the same extent as a manufacturer, where the seller markets a product as its own. *See e.g., Restatement (Second) of Torts §* 400 (1965). Regardless of its doubts that Cheyenne was the vendor of the lamp at issue in the *Boykin* case, RLI agrees that for purposes of its current summary judgment motion, it can be assumed that the lamp was a Cheyenne product.

### 3. The Vendor Agreement.

In connection with its sale of products to Wal–Mart, Cheyenne entered into a vendor agreement. The agreement required Cheyenne to indemnify and hold Wal–Mart harmless from, among other things, any

---

**10.** Specifically, Parker testified Groton was assigned a separate number "so that we could direct import items from the Orient." *August* 22, 2000, Deposition of Teresa Parker* at 52. Cheyenne had a separate number assigned to it by Wal–Mart for domestic purchases. *Id.*

claim of personal injury or death "claimed to result in whole or in part from any actual or alleged defect in such merchandise, whether latent or patent, including actual or alleged improper construction or design of said merchandise or the failure of said merchandise to comply with specifications or with any express or implied warranties ."

The agreement also required Cheyenne to maintain liability insurance in Wal–Mart's name. Long understood the vendor agreement required Cheyenne to indemnify Wal–Mart for claims arising from incidents that involved a defective or allegedly defective Cheyenne product.

In the *Boykin* action, Wal–Mart sued Cheyenne for indemnity. Following the settlement, the action was dismissed with prejudice.

### 4. The Fire Risk and the Retrofit Program.

On April 17, 1997, two law firms sent the chief executive officers of "all significant players in the Torchiere Halogen Lamp industry," including Cheyenne and Wal–Mart, a letter discussing the dangerous characteristics of torchiere halogen lamps. *Mediation Brief filed in the Boykin case by the plaintiffs* at 4. The letter discussed, among other things, the fire hazard associated with the heat output of the. tubular halogen bulbs used in the lamps. *Id.* The most common cause of fires was noted to be the result of direct contact between the top of the lamp and combustible materials. *Id.* at 5. The second most common cause of fires in connection with the operation of these lamps involved exploding halogen bulbs. *Id.* This type of failure accounted for twenty-five percent of the incidents reported to the United States Consumer Product Safety Commission (CPSC). *Id.*

With respect to exploding bulbs, the mediation brief further stated as follows:

In part because of the extreme heat produced by these bulbs, they are very delicate. Additionally, unlike the vacuum existing inside of an incandescent bulb, the tubular halogen bulb is gas pressurized. Tubular halogen bulbs are known to explode for a variety of reasons. These reasons include poor electrical connections with the lamp fixture, thin glass and differential heating of the glass surface of the bulb because of the presence of foreign matter on part of the bulb (such as skin oil if the bulb is touched by a finger, an insect part, or even common household dust). When a pressurized tubular halogen bulb explodes, red hot fragments of glass and the tungsten steel element from the bulb are launched out of the "wok" and around the room where the lamp sits.

*Id.* at 5.

The third most frequent cause of fires in connection with the use of these lamps was the result of electrical short circuiting. *Id.*

Beginning in the 1990's, Wal–Mart, its third-party claims administrator, Claims Management, Inc., and Cheyenne began receiving complaints from customers about fires allegedly caused by the halogen lamps. In 1992, the CPSC began tracking incidents involving the halogen lamps igniting fires, bulbs exploding, or the lamps themselves bursting into flame. *Id.* at 6. In July of 1996, CPSC issued a news release which warned consumers on the fire hazards associated with halogen torchiere floor lamps.

As a result of CPSC's exercise of its authority in relation to halogen lamps, Underwriters Laboratories (UL) revised its standards applicable to halogen lamps. The new performance standards became effective in February of 1997. To pass the new performance standards it was necessary that cheesecloth be able to be placed over the top of the lamp for seven hours without having the cheesecloth ignite. *Id.*

at 7. To comply with the standards, most manufacturers altered the design of the lamps by adding a dome-shaped guard made of a heavy gauge wire that fit over the top of the "wok" portion of the lamp. *Id.* "The purpose of this guard was to prevent contact between combustibles and the hottest portions of the lamp and bulb." *Id.*

In January of 1997, the CPSC met with "major industry players" to discuss a potential recall of halogen lamps. *Id.* In an effort to avoid a recall, "the industry 'volunteered' its cooperation directed at reducing the number of fire incidents caused by combustibles coming into the contact with the top of the lamp." *Id.* "A plan was devised to distribute a 'retrofit guard' free of charge to consumers that was similar in design to the guard most manufacturers began installing on their lamps to comply with the new UL standard, effective February, 1997." *Id.* at 8. The retrofit guards were to be made available at retail outlets and by calling a toll free number beginning in August of 1997.

No recall was instituted as a result of the CPSC meeting. Manufacturers and retailers were free to sell their existing inventory of lamps ("old style" lamps) without a guard over the top of the "wok" of the lamp. Wal–Mart continued to sell the old style lamps.[11] *August 22, 2000, Deposition of Teresa Parker* at 133–34.

As of November 1996, Cheyenne ceased all distribution of old style lamps. *August 24, 2000, Deposition of Alan Long* at 94. In January of 1997, Cheyenne began distributing the "new style" lamps to Wal–Mart. *Id.*

By August 19, 1997, all Wal–Mart stores in the United States were to have the retrofit cage guard program in place. *August 22, 2000, Deposition of Teresa Parker* at 179. The Oceanside, California, Wal–Mart store, at which the *Boykin* plaintiffs purchased the lamp at issue in that case, participated in the retrofit program. As set up, Wal–Mart's retrofit program made the guards available at the courtesy desk free of charge to customers. Each participating store was also to post a two by two foot sign at the back of the lamp displays notifying customers that the guards were available. Additionally, the stores were to post "flags" in the lighting department on the shelves near the lamps notifying customers that the guards were available. Wal–Mart experienced some difficulties in obtaining a sufficient supply of the retrofit guards and on occasion ran completely out of the guards. Cheyenne's only involvement in the retrofit program at the Wal–Mart stores was its payment of Cheyenne's portion of Wal–Mart's expense to participate in the program. *August 24, 2000, Deposition of Alan Long* at 123–24.

After she purchased the lamp in April or May of 1997, Lisa Sikorski never returned to the lighting department at the Oceanside Wal–Mart store. When the lamp was purchased, there were no signs or warnings posted by Wal–Mart about the availability of a safety guard or the dangers and injuries caused by this product. The retrofit guards were not designed to provide protection against exploding bulbs. *See e.g., August 24, 2000, Deposition of Alan Long* at 161.

**5. Evaluations of Liability.**

On January 29, 1999, David Clark, a RLI officer, wrote the following:

---

**11.** With respect to the Oceanside, California, Wal–Mart store, Sean Richard in his declaration stated that after he learned of the retrofit program the "old style" halogen lamps were taken off the shelves until the guards were available. No evidence indicates any other Wal–Mart store acted similarly. Additionally, Parker advised the stores that there was no recall of the halogen lamps and that existing stock could be sold.

This matter has been settled for a total of $11,000,000. On January 8, 1999, counsel for plaintiffs made a settlement demand against named insured Cheyenne Industries and Walmart to pay $11 million. The offer was to expire on January 25, 1999. Subsequently, both Cheyenne and Walmart demanded that Cheyenne's primary carrier (St.Paul) and RLI tender their policy limits. Our overall evaluation was that a verdict of $30M to $40M would be the probable outcome in the event this matter proceeded to trial.

Walmart qualified as an additional insured under the RLI policy for any liability arising out of Cheyenne's conduct. In addition, Cheyenne had contracted to indemnify Walmart for any damages arising out of the halogen lamps. We contended that (1) Walmart had engaged in acts of independent negligence which were not covered under our policy or subject to the indemnity agreement, and (2) even if Walmart was an additional insured, its primary policy with National Union should be exhausted before RLI's umbrella policy was applicable. Cheyenne, Walmart and National Union disagreed with RLI and contended that Walmart was an additional insured, that the indemnity agreement fully applied to this claim and that both Cheyenne's primary and umbrella policies must be exhausted before the National Union policy would apply.

In the face of an expiring policy limits demand, demands from Cheyenne and Walmart to settle this claim, a likely verdict of at least $11M for Cheyenne's liability alone, RLI acquiesced and gave defense counsel the authority to negotiate a settlement. Defense counsel attempted to reach a settlement below the policy limits demand, but was unsuccessful. RLI's agreement to fund the settlement is subject to a reservation of rights. Specifically, it has reserved the right to seek, reimbursement from Walmart and/or National Union for money spent in resolution of the claims of independent negligence against Walmart.

During his deposition, Clark testified he did not consider Cheyenne to be the distributor of the lamp. *August 30, 2000, Deposition of David Clark* at 71. *See also September 12, 2000, Declaration of David Clark* at ¶ 9 ("[I]t was my belief that Cheyenne had no liability for the alleged injuries."). Further, he considered Wal–Mart to be at fault because it was in charge of the retrofit program. *Clark Deposition* at 71.

In his declaration filed September 12, 2000, Clark states:

> At the time RLI agreed to pay its policy limit of $10,000,000 to settle the *Boykin* action, I believed that there was a potential for a jury verdict against WAL–MART on the issue of liability, and that there was substantial exposure to WAL–MART, including potential punitive damages. Based on the information provided to me in handling the claim, I believed that the jury could reasonably find WAL–MART to be 100% liable for the damages claimed in the *Boykin* action.

*Id.* at ¶ 6. Clark also states it was his belief that "a jury verdict finding WAL–MART solely responsible for the injuries at issue in the *Boykin* action was likely." *Id.* at ¶ 8.

In the opinion of Wal–Mart's defense counsel in the *Boykin* case, Barry C. Snyder, "Cheyenne's exposure alone in the *Boykin* action well exceeded $11 million." *September 6, 2000, Declaration of Barry C. Snyder* at ¶ 11. In Snyder's estimation, the focus of the *Boykin* case, "from the initial filing of the Complaint to eventual settlement, was solely on the products liability claim." *Id.* at ¶ 15. Further, Snyder points out that Lisa Sikorski's testimony that she never returned to the lighting

department at the Wal–Mart Oceanside store was significant as it demonstrated there could be no causation between Wal–Mart's alleged independent negligence, in connection with the retrofit program and in continuing to sell the "old style" halogen lamps, and the injuries to the *Boykin* plaintiffs. *Id.*

By declaration, Duncan Koler, the plaintiffs' attorney in the *Boykin* case, states he considered the liability of Wal–Mart and Cheyenne to be on essentially equal footing.

### 6. Allocation of Risk between the Insurers.

The following facts are undisputed: (1) Cheyenne has admitted that it is the manufacturer/distributor of the lamp at issue and that it sold the halogen lamp causing injuries to the *Boykin* plaintiffs to Wal–Mart; (2) Cheyenne had a written vendor agreement with Wal–Mart that contained an indemnification provision and an insurance requirements provision; (3) Cheyenne had two policies of insurance in full force and effect during the time period relevant to the *Boykin* litigation—the St. Paul policy of primary insurance and the RLI umbrella or excess policy; (4) coverage under both the St. Paul and RLI policies extended to Wal–Mart as an additional or other insured; (5) Wal–Mart had a policy of insurance in full force and effect during the time period relevant to the *Boykin* litigation—the National Union policy which provided it was primary as to

Wal–Mart; (6) Cheyenne was not an "insured" under the National Union policy; and (7) coverage, or at least potential coverage, was triggered under applicable products liability law. That is the insureds under each policy were potentially liable to the *Boykin* plaintiffs. Each policy in term provided coverage to the insured for all sums the insured became legally obligated to pay as damages as a result of the occurrence at issue in the *Boykin* case.

■ We start where we left off in our February 23, 2000, opinion; that is, with the proposition that the express language of the applicable insurance policies governs the allocation of liability among the insurance companies. Plaintiffs ask us to reconsider this ruling on a number of grounds.

We find no grounds on which to reconsider our prior ruling. First, we do not believe our prior ruling prohibits discussion of the indemnity provisions of the vendor agreement in connection with determining whether RLI is, in fact, entitled to reimbursement from National Union. We merely ruled that the provisions of the vendor agreement did not override or take precedence over the express policy provisions.

Second, we do not believe the fact that a certificate of insurance [12] showing Wal–Mart as an additional insured on the RLI policy alters the court's analysis in any way. There was, and is, no doubt that coverage was afforded to Cheyenne and

---

12. The certificate of insurance was issued by Companies Agency, Inc., on November 24, 1997. St. Paul and RLI are listed as the companies affording coverage. The certificate states that the named insureds include Wal–Mart. *Exhibit B to the Declaration of James P. Wagoner filed on September 11, 2000.* RLI points out the certificate of insurance was issued more than a month after the accident in the *Boykin* case. Further, David Clark, of RLI, states Companies Agency, Inc., is not, to the best of his knowledge, authorized to do business on behalf of, or to bind coverage for, RLI, Clark also asserts the certificate was never sent to RLI and RLI never issued an additional insured endorsement to Wal–Mart on any policy which covered the Frank Fletcher entities. The court also notes the certificate was issued after the *Boykin* claim was reported to National Union on November 3, 1997, as a catastrophic loss claim. *See Exhibit 1 to the November 30, 2000, Deposition of David Sneed.*

Wal–Mart under both the St. Paul and RLI policies. The question is when does this coverage "kick-in"—before or after exhaustion of the National Union policy or at some other point entirely.

Third, we find the November 27, 1998, letter from Cheyenne's counsel to RLI's counsel of little probative value. While Cheyenne's counsel makes the statement that the RLI policy was purchased, among other reasons, to comply with its obligations to vendors and to ensure that all indemnity claims available to its vendors would be covered, this letter was authored after the initiation of the *Boykin* litigation and after the dispute that is the subject of this declaratory judgment action arose.

In short, the letter merely reflects the litigation position taken by Cheyenne's counsel. The letter conveys no facts, was authored long after the policy's purchase, and the stance taken by counsel is not supported in any way by the hundreds of pages of materials presented to this court. The letter is not evidence that Wal–Mart requested Cheyenne to produce further evidence of insurance, or that the RLI policy was procured to fulfill, or represented as fulfilling, Cheyenne's contractual obligation.

Finally, plaintiffs ask us to reconsider our February 23rd ruling because we now know Cheyenne cannot be brought into this action by third-party complaint. Obviously had there been a proper mechanism to bring Cheyenne into this lawsuit, it would have promoted judicial economy. However, the fact that Cheyenne could not be brought into this case by third-party complaint does not alter in anyway the court's analysis in the February 23, 2000, opinion.

■ Having rejected plaintiffs' motion for reconsideration, we turn to the issue of allocation of the risk between the insurers. We address first RLI's argument that Wal–Mart's negligence was as a matter of law an intervening or superseding cause of the injury to the *Boykin* plaintiffs. Basically, RLI's argument is that Cheyenne should be relieved of responsibility for the defective product because Wal–Mart's conduct in continuing to sell the "old style" lamps and in failing to warn purchasers of the fire danger in connection with these lamps shifted the proximate cause for the *Boykin* plaintiffs' injuries to Wal–Mart.

In part, RLI complains of Wal–Mart's continuing to sell the "old style" lamps after Cheyenne ceased distributing them and after the "new style" lamps were available to Wal–Mart. It is true Wal–Mart was being supplied the "new style" lamps before the lamp at issue in the *Boykin* case was sold to Lisa Sikorski. However, the court believes Wal–Mart has a valid point that even if it had sold a "new style" lamp to Sikorski this would not have prevented the injuries to the *Boykin* plaintiffs. This is true because there is absolutely no evidence [13] in the record suggesting that a wire cage guard over the wok portion of the lamp, which was intended to prevent combustible materials from coming into contact with the hottest portion of the lamp, had any safety value in preventing fires caused by exploding halogen bulbs.

■ In California,[14] "[i]n products liability cases, a consumer injured by a defec-

---

**13.** In Alan Long's deposition he testifies the wire cage guard provides no protection against exploding bulbs. *August 24, 2000, Deposition of Alan Long* at 161.

**14.** Since this case is a diversity case, the court must apply Arkansas choice of law rules.

*Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Whirlpool Corp. v. Ritter,* 929 F.2d 1318 (8th Cir.1991). In *Wallis v. Mrs. Smith's Pie Co.,* 261 Ark. 622, 550 S.W.2d 453 (1977), the Arkansas Supreme Court was presented with an issue involving the proper

tive product may sue any business entity in the chain of production and marketing, from the original manufacturer down through the distributor and wholesaler to the retailer; liability of all such defendants is joint and several." *Kaminski v. Western MacArthur Co.*, 175 Cal.App.3d 445, 220 Cal.Rptr. 895, 900 (1985) (citations omitted). *See also Expressions at Rancho Niguel Ass'n v. Ahmanson Developments, Inc.*, 86 Cal.App.4th 1135, 103 Cal.Rptr.2d 895, 898 (2001) ("Where multiple tortfeasors are responsible for an indivisible injury suffered by the plaintiff, each tortfeasor is jointly and severally liable to the plaintiff for those damages and thus may be held individually liable to the injured plaintiff for the entirety of such damages."). Similarly when liability is premised on a negligence theory, a non-manufacturing supplier of a product "who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." *Dow v. Holly Manufacturing Co.*, 49 Cal.2d 720, 321 P.2d 736, 740 (1958) (Applying the theory to a building contractor) (citations omitted). *See also Restatement (Second) of Torts* § 400 (1965).

■ The issue of superseding cause is ordinarily a question of fact. *See e.g., Torres v. Xomox Corp.*, 49 Cal.App.4th 1, 56 Cal.Rptr.2d 455 (1996). As the California courts have remarked, "[a] third party's failure to prevent harm threatened by the defendant's conduct is sometimes held

to constitute a superseding cause of that harm (Rest.2d Torts, § 452), but it is 'impossible to state any comprehensive rule as to when such a decision will be made.'" *Springmeyer v. Ford Motor Co.*, 60 Cal. App.4th 1541, 71 Cal.Rptr.2d 190, 199 (1998) (*quoting Restatement of Torts (Second)* § 452 cmt. (f) 1965)). It has been stated that "[t]he basic rule on the subject is that '[t]hird party negligence which is the immediate cause of an injury may be viewed as a superseding cause when it is so highly extraordinary as to be unforeseeable. [F]oreseeability is a question for the jury unless undisputed facts leave no room for a reasonable difference of opinion,' and '[t]hus, the issue of superseding cause is generally one of fact.'" *Id.* (citations omitted).

We certainly cannot say that Wal-Mart's act of continuing to sell its existing supply of "old style" halogen lamps after the "new style" lamps were available was so highly extraordinary as to be unforeseeable. In fact, the testimony of Cheyenne's officers indicates it did foresee such an occurrence and in fact expected Wal-Mart to act in that manner. Further, we cannot say Wal-Mart's continued marketing of the halogen lamps despite its knowledge of the fire hazards and dangers associated with torchiere halogen lamps as a matter of law constitutes a superseding cause.

■ We now turn to the question of the allocation of liability between the multiple

---

choice of law in a tort case resulting from a motor vehicle accident, and the court expressed approval of Dr. Robert Leflar's "choice-influencing considerations," which are: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. See also R. Leflar, L. McDougal & R. Felix, American Conflicts Law Section 95, at 279 (4th ed.1986).

The parties seem to agree that California law is applicable to issues of liability and causation. As they point out, the halogen lamp was sold in California, the personal injuries occurred in California, the injuries were to California citizens, and the *Boykin* case was filed in California. In any event, no party has suggested a different result would be reached if the law of Arkansas is applied instead of the law of California.

insurers. All three policies were in full force and effect. All three policies apply to the same occurrence.

RLI contends the risk should be allocated between the policies as follows: First, the $1 million coverage under the St. Paul policy; Second, the $10 million coverage under the National Union policy; and Third, the $10 million coverage under the RLI policy. Under this scenario, the coverage under the RLI policy would not be implicated by the $11 million settlement of the *Boykin* matter and RLI and Cheyenne would in effect receive the benefit of a policy purchased by Wal–Mart.

In contrast, Wal–Mart and National Union contend the risk should be allocated between Cheyenne's insurers only. While plaintiffs will no doubt argue the court has oversimplified their position, plaintiffs' arguments rely on two basic facts: First, Wal–Mart has a written vendor agreement with Cheyenne that contains explicit indemnification and insurance requirements; and Second, Cheyenne, the manufacturer/distributer of the defective product at issue, is not an "insured" under the National Union policy. These facts, in plaintiffs' view, prevent Cheyenne and its insurer, RLI, from reaping the benefit of National Union's policy. To allow RLI to benefit from the existence of the National Union policy, in plaintiffs' opinion, directly contradicts and renders meaningless, the indemnification and insurance requirement provisions of the vendor agreement.

Once again, we believe the answer lies in the policy language. The St. Paul policy was specifically listed as scheduled underlying insurance on the RLI policy. With respect to contract liability the St. Paul policy provides as follows:

> We won't cover the protected person's liability for injury or damage assumed under any contract or agreement.
> However, we won't apply this exclusion to liability for injury or damage the pro-tected person would have without the contract or agreement. Nor will we apply this exclusion to the protected person's liability for bodily injury or property damage assumed under a covered contract made before the bodily injury or property damage happens.

The policy defined covered contract to mean any "contract or agreement under which you assume the tort liability of another to pay damages for covered bodily injury or property damage that's sustained by others." Tort liability is defined as "a liability that would be imposed by law without any contract or agreement."

In the limits of liability section, the RLI policy provides:

> Regardless of the number of (1) **Insureds** under this policy ... we shall only be liable for the **ultimate net loss** in **excess of:**
> 1. the applicable limits of **scheduled underlying insurance** stated in Item 5. of the Declarations, for **occurrences** covered by **scheduled underlying insurance**, plus the limits of any **unscheduled underlying insurance** which also provides coverage for such **occurrences.**

Unscheduled underlying insurance is defined as "any insurance policies available to any **insured** whether primary, excess, excess-contingent, or otherwise except the policies listed in the Schedule of Underlying Insurance. **Unscheduled underlying insurance** does not include insurance purchased specifically to be excess of this policy."

The RLI policy's "other insurance" provision states:

> Whenever the **insured** is covered by other primary, excess or excess-contingent insurance not scheduled on this policy as **scheduled underlying insurance** this policy shall apply only in excess of, and will not contribute with,

such other insurance. This policy shall not be subject to the terms, conditions or limitations of any such other insurance. In the event of payment under this policy **where the insured** is covered by such other insurance, we shall be subrogated to all of the **insured's** rights of recovery against such other insurance. The **insured** shall execute and deliver instruments and papers, including assignments of rights, and do whatever else is necessary to secure such rights.

With respect to contractual liability, the RLI policy has an endorsement which provides:

> It is agreed that this policy shall not apply to any liability assumed by an insured under any contract or agreement unless such liability is covered by valid and collectible underlying insurance as described in Schedule of Underlying insurance, to the full limits of such underlying insurance, and then only for such hazards for which coverage is afforded under said underlying insurance.

The endorsement also states that "[n]othing herein shall be held to vary, alter, waive or extend any of the terms, conditions, or limitations of the policy to which this endorsement is attached other than as stated above."

Under the RLI policy, the definition of the term "insured" in paragraph "g" provides that the term includes any person or organization included as an insured under the provisions of the scheduled underlying insurance. As mentioned above, Wal–Mart also states a certificate of insurance was issued to it on the RLI policy.

The RLI policy also contains a cross liability exclusion. This exclusion provides as follows: "This insurance does not apply to any liability for any action, claim or suit brought by one insured against any other insured covered under this policy."

While plaintiffs stress the fact that Cheyenne was not an "insured" under the National Union policy, this does not change two critical facts. First, coverage existed under both the National Union and the RLI policies for any damages the respective insureds became legally obligated to pay the *Boykin* plaintiffs. In this case, Cheyenne and Wal–Mart were jointly and severally liable to the *Boykin* plaintiffs for damages. Second, Wal–Mart fell within RLI's definition of an "insured" The language of RLI's policy clearly and unambiguously provides that liability under it does not apply until all other insurance, scheduled or unscheduled, held by **any insured is exhausted.** It does not require that the insureds be the same on the other available insurance policies.

In other words under the policy language, RLI benefits from the existence of any insurance applying to the occurrence whether or not the insurance was obtained by the principal or named insured. RLI benefits from the higher amount of primary coverage available to its insureds because the policy expressly provides that RLI is liable only for the **ultimate net loss** in **excess of** the applicable limits of both scheduled and unscheduled underlying insurance which provides coverage for such occurrences.

Plaintiffs, of course, contend such a result defeats the purpose of Wal–Mart entering into the vendor agreements which contain the insurance requirements and the indemnification provisions. If we require plaintiffs to reimburse RLI, they state they will then be forced to pursue a contractual indemnity claim against Cheyenne. If plaintiffs pursue such a claim, they state Cheyenne will undoubtedly look to RLI to provide a defense and to pay any judgment rendered in such a case. In short, based on the circuity of action that will result by the court's applying the lan-

guage of RLI's policy in such a way as to require exhaustion of the National Union policy limits before coverage on the RLI policy is triggered, plaintiffs ask us to leave the parties where they stand.

There is, of course, before us no claim by Wal–Mart against Cheyenne for indemnification or breach of the insurance requirements of the vendor agreement. As discussed above, this court lacks jurisdiction over any such claim. Likewise, there is no claim before us in which Cheyenne seeks to enforce the contractual liability endorsement of the RLI policy or any other provision of that policy that might provide coverage for an indemnification claim asserted by Wal–Mart.

█ RLI contends no circuitous action will result in this case. It argues that neither Wal–Mart nor National Union have any rights of subrogation against Cheyenne or RLI. RLI's argument is based on the following two points: (1) Wal–Mart sued Cheyenne for all types of indemnity, including contractual indemnity, as part of the underlying *Boykin* action and those claims were dismissed with prejudice following the settlement; and (2) the *Boykin* settlement was adjudicated by the California court to be in good faith, which forever bars any claims for equitable contribution or indemnity.

█ Wal–Mart and National Union argue the dismissal with prejudice in the *Boykin* case only dismissed the causes of action pled in Wal–Mart's cross-complaint. Plaintiffs state the cross-complaint included only claims for equitable or implied indemnity and did not contain its, as yet unaccrued, claim for express contractual

indemnity.[15] Further, they point out the court order specifically states that "[a]ny and all claims against settling tortfeasors for *equitable* comparative contribution or partial comparative indemnity based on comparative negligence or comparative fault . . . are forever barred."

Under California law, Wal–Mart and National Union contend a cross-complaint between defendants is not considered compulsory where the only relief sought is declaratory. Further, even if a cross-complaint is asserted, plaintiffs state there is no obligation to join all causes of action. In other words, plaintiffs state they were entitled to bring a separate suit on their separate unaccrued cause of action for express contractual indemnity even though the claim could have been asserted in the cross-complaint in the *Boykin* case.

Plaintiffs therefore argue that *res judicata* principles do not operate to bar their cause of action on the distinct cause of action for express contractual indemnity. Further they state the "good faith" settlement does not bar an indemnity claim based on an express contract. *C.L. Peck Contractors v. Superior Court*, 159 Cal. App.3d 828, 205 Cal.Rptr. 754 (1984).

█ We agree with plaintiffs. First, having reviewed the cross-claims and the other materials submitted by the parties, it appears clear to the court that plaintiffs' cross-claim asserted claims of equitable or implied indemnity only. *See Expressions at Rancho Niguel Assoc. v. Ahmanson Developments, Inc.*, 86 Cal.App.4th 1135, 103 Cal.Rptr.2d 895, 898 (2001) ("Equitable indemnity principles govern the alloca-

---

**15.** Plaintiffs cite numerous California cases which stand for the proposition that neither the claim for express contractual indemnity nor the claim for equitable indemnity accrue until the indemnitee actually suffers a loss by way of payment. *See e.g., FNB Mortgage Corp. v. Pacific General Group*, 76 Cal.App.4th 1116, 90 Cal.Rptr.2d 841 (1999) (express indemnity); *Card Construction Co. v. Ledbetter*, 16 Cal.App.3d 472, 94 Cal.Rptr. 570 (1971) (equitable indemnity). Thus, a cross-complaint for indemnity on an unaccrued cause of action is considered a request for declaratory relief.

tion of loss or damages among multiple tortfeasors whose liability for the underlying activity is joint and several."). Second, although plaintiffs may have been able to assert a cross-claim for declaratory relief on the contractual indemnity claim, preclusive effect should not be given on a claim that has not yet accrued and is therefore not ripe for adjudication. The claim for contractual indemnification is not barred by the doctrine of res judicata.[16] *See Wilshire Ins. Co. v. Tuff Boy Holding, Inc.*, 86 Cal.App.4th 627, 103 Cal.Rptr.2d 480, 491–92 (2001) ("[A]n indemnity claim survives a settlement by the defendant who is seeking indemnity. The settling defendant need not file a cross-complaint in the principal suit by may file its own indemnity action, and the principal lawsuit does not operate as res judicata or collateral estoppel to bar the indemnity action.") (citations omitted). *See also, Lawyers Surety Co. v. Cagle*, 49 Ark.App. 131, 898 S.W.2d 476 (1995) (Rejecting the argument that a claim for indemnity was barred because it should have been litigated by counterclaim or cross-claim in an earlier probate action. The court noted the claim would have been a permissive cross-claim rather than a compulsory counterclaim. Further, the court noted that a claim for indemnity arose upon satisfaction of judgment and could have been litigated in a separate action to recover money paid. The court concluded the indemnity claim was therefore not barred by res judicata).

Nor do we believe the California court's approval of the good faith settlement bars plaintiffs' potential claim for contractual indemnification. In *Heppler v. J.M. Peters Company*, 73 Cal.App.4th 1265, 87 Cal.Rptr.2d 497 (1999), the court stated a good faith settlement bars actions for equitable indemnity by the remaining joint tortfeasors. *Id.* at 513–14. It noted the good-faith confirmation hearings address equitable indemnity issues while proceedings to enforce contractual indemnity looked to the reasonableness of the payment of the settling defendant. *Id.*

Thus, the question is whether under the applicable policy provisions the existence of Cheyenne's indemnification agreement dictates that its insurers bear the entire loss. Under the circumstances of this case, we believe it does not. The RLI policy does not obligate RLI to pay as damages all sums Cheyenne is legally obligated to pay under its contract with Wal–Mart. Instead, the limits of liability contained in the RLI policy explicitly require exhaustion of all available coverage before the RLI limits become applicable. Thus, if the settlement in the *Boykin* case had exceeded $11 million, RLI would have been obligated to indemnify its insureds, or pay the loss, above $11 million. The RLI policy was not implicated by the *Boykin* settlement.

### Conclusion.

For the reasons stated, the plaintiffs' motion for summary judgment and their motion for reconsideration will be denied. The defendant's motion for summary judgment will be granted. In other words, the court finds RLI is correct and National Union and Wal–Mart should have funded $10 million of the settlement of the *Boykin* case. RLI is therefore entitled to recover the $10 million it paid from National Union and Wal–Mart. A separate order in accor-

---

**16.** We determine the preclusive effect of a state court judgment according to state law. *See e.g., Walsh Construction Co. of Illinois v. National Union Fire Ins.*, 153 F.3d 830 (7th Cir.1998) ("Since an Illinois court issued the declaratory judgment, we look to the law of that state to determine whether claim preclu-

sion (res judicata) bars Walsh's claim."); *Klipsch, Inc. v. WWR Technology, Inc.*, 127 F.3d 729 (8th Cir.1997) (Preclusive effect of a prior judgment is determined by the rules of the forum that provided the substantive law underlying the judgment).

dance herewith will be concurrently entered.

### SUMMARY JUDGMENT

On this 23rd day of March, 2001, upon consideration of the parties' cross-motions for summary judgment, the court finds for the reasons stated in a memorandum opinion of even date as follows:

1. The plaintiffs' motion for summary judgment and their motion for reconsideration are denied;

2. The defendant's motion for summary judgment is granted. The court finds RLI is entitled to recover of and from National Union and Wal–Mart the sum of $10,000,000. Said sum represents the amount RLI, an excess insurer, paid to fund the settlement of the *Boykin* case. *Boykin, et al. v. Wal–Mart Stores, Inc., et al.*, Case No. 717912, filed in the San Diego County Superior Court, California.

IT IS SO ORDERED.